GUTRIDE SAFIER LLP
Seth A. Safier (State Bar No. 197427)
  seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
  marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
  todd@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile:  (415) 449-6469

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRANDON MOORE, DANIEL ALDANA, and HOPE KAMBICK, as individuals, on behalf of themselves, the general public, and those similarly situated,<br><br>　　　　　　　　Plaintiffs,<br><br>　　v.<br><br>LUXOTTICA OF AMERICA, INC.,<br><br>　　　　　　　　Defendant. | CASE NO.<br><br>CLASS ACTION COMPLAINT FOR INVASION OF PRIVACY UNDER CALIFORNIA'S CONSTITUTION; INTRUSION UPON SECLUSION; WIRETAPPING IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CALIFORNIA PENAL CODE § 631); USE OF A PEN REGISTER IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CALIFORNIA PENAL CODE § 638.51); COMMON LAW FRAUD, DECEIT AND/OR MISREPRESENTATION; AND UNJUST ENRICHMENT<br><br>JURY TRIAL DEMANDED |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **TABLE OF CONTENTS**

INTRODUCTION .................................................................................................. 4

THE PARTIES .................................................................................................... 7

JURISDICTION AND VENUE ........................................................................... 7

TOLLING AND RELATED ARBITRATION PROCEEDINGS ........................ 8

SUBSTANTIVE ALLEGATIONS ................................................................... 10

    A.    Defendant Programmed the Websites to Include Third-Party Resources that Utilize Cookie Trackers. ............................................ 10

    B.    Defendant Falsely Informed Users That They Could "REJECT" the Websites' Use of Cookies ...................................................... 17

    C.    Defendant Also Falsely Informed Users That They Could "Opt Out" of the Cookies that Share or Sell Users' Personal Information. ........ 22

    D.    The Private Communications Collected As a Result of Third Party Cookies Transmitted When Visiting Defendant's Websites. ............ 28

        1.    The Websites Cause the Interception of the Contents of Communications ...................................................................... 28

        2.    Adobe Cookies (Oakley; LensCrafters; Sunglass Hut; Arnette; Contacts Direct; Costa; Essilor; Foster Grant; Glasses.com; Native Eyewear; Oliver Peoples; Pearle Vision; Persol; Ray-Ban; Readers; Target Optical; and Vogue Eyewear Websites) ...................... 31

        3.    Google Cookies (Oakley; Costa; Essilor; Eyebuydirect; Foreyes; Foster Grant; Glasses.com; and Pearle Vision Websites) .............. 41

        4.    Facebook Cookies (LensCraftsters; Costa; Foreyes; and Native Eyewear Websites) ................................................................. 48

        5.    Pippio Cookies (Oakley; LensCrafters; Ray-Ban; and Sunglass Hut Websites) .................................................................................... 52

        6.    Additional Third-Party Cookies ........................................... 53

    E.    The Private Communications Collected are Valuable. ..................... 55

PLAINTIFFS' EXPERIENCES ........................................................................ 57

CLASS ALLEGATIONS ................................................................................... 66

CAUSES OF ACTION ....................................................................................... 69

    First Cause of Action: .............................................................................. 69

    Invasion of Privacy Under California's Constitution ............................... 69

    Second Cause of Action: ........................................................................... 72

    Intrusion Upon Seclusion ......................................................................... 72

    Third Cause of Action: ............................................................................. 74

    Wiretapping in Violation of the California Invasion of Privacy Act (California Penal Code § 631) ........................................................................ 74

    Fourth Cause of Action: ........................................................................... 79

    Use of a Pen Register in Violation of the California Invasion of Privacy Act (California Penal Code § 638.51) .......................................................... 79

CLASS ACTION COMPLAINT

Fifth Cause of Action:.................................................................................. 80

Common Law Fraud, Deceit and/or Misrepresentation................................. 80

Sixth Cause of Action: ................................................................................. 83

Unjust Enrichment ........................................................................................ 83

PRAYER FOR RELIEF ....................................................................................... 84

CLASS ACTION COMPLAINT

Plaintiffs Brendon Moore, Daniel Aldana, and Hope Kambick ("Plaintiffs") bring this action on behalf of themselves, the general public, and all others similarly situated against Luxottica of America, Inc. ("Defendant" or "Luxottica"). Plaintiffs' allegations against Defendant are based upon information, belief and upon investigation of Plaintiffs' counsel, except for allegations specifically pertaining to Plaintiff, which are based upon plaintiffs' personal knowledge.

**INTRODUCTION**

1.      This Class Action Complaint concerns an egregious privacy violation and total breach of consumer trust in violation of California law. When consumers visit Defendant's websites (including, oakley.com (the "Oakley Website"); lenscrafters.com (the "LensCrafters Website"); sunglasshut.com (the "Sunglass Hut Website"); arnette.com (the "Arnette Website"); contactsdirect.com (the "Contacts Direct Website"); costadelmar.com (the "Costa Website"); essilor.com (the "Essilor Website"); eyebuydirect.com (the "EyeBuyDirect Website"); foreyes.com (the "ForEyes Website"); fostergrant.com (the "Foster Grant Website"); glasses.com (the "Glasses.com Website"); nativeyewear.com (the "Native Eyewear Website"); oliverpeoples.com (the "Oliver Peoples Website"); pearlevision.com (the "Pearle Vision Website"); persol.com (the "Persol Website"); ray-ban.com (the "Ray-Ban Website"); readers.com (the "Readers Website"); targetoptical.com (the "Target Optical Website"); vogue-eyewear.com (the "Vogue Eyewear Website"); each a "Website" and, collectively, the "Websites"), Defendant displays to them a popup cookie consent banner, each of which differs slightly in appearance across the Websites, but each of which is substantially similar to the others in content and function.[1] Defendant's cookie banner on each Website discloses that the Website uses cookies but expressly gives users the option to control how they are tracked and how their personal data is used. For example, Defendant assures visitors to the Oakley Website (available at oakley.com) that they can choose to "REJECT" cookies, as shown in the following screenshot (stretched to enhance readability):

---

[1] The LensCrafters Website popup cookie consent banner is substantively different as addressed below.

1
2
3
4



5       2.      Similarly, Defendant assures visitors to the LensCrafters Website that rather than

6   accepting all cookies, they can manage their cookie selections or choices by clicking or selecting

7   the "Cookie Manager" link.[2] Visitors who follow this link on the LensCrafters Website are then

8   directed to a "Privacy Preferences" window, where Defendant further represents that users can

9   opt out of certain cookies, including Analytics, Social, and Marketing cookies, as shown in the

10  following screenshots:

11          a.   The Lenscrafters Website popup cookie consent banner:

12



13

14          b.   The Lenscrafters Website "Privacy Preferences" window:

15

16



17

18

19

20

21

22

23

24

25

26

27

28

---

[2] As further explained below, the "Cookie Manager" link also appears as an alternate method of opting out of or rejecting cookies on the other Websites' popup cookie consent banners.

CLASS ACTION COMPLAINT

3.     Like most internet websites, Defendant designed the Websites to include resources and programming scripts from third parties that cause those parties to place cookies and other similar tracking technologies on visitors' browsers and devices and/or transmit cookies along with user data. However, unlike other websites, Defendant's Websites offer consumers a choice to browse without being tracked, followed, and targeted by third party data brokers and advertisers. But Defendant's promises are outright lies, designed to lull users into a false sense of security. Even after users elect to "REJECT" cookies, or specifically "opt out" of all cookies that sell or share users' personal information by way of the Privacy Preferences window, Defendant surreptitiously causes several third parties—including Adobe, Inc. (omtrdc.net), Google LLC (Google Analytics and Doubleclick), Meta Platforms, Inc. (Facebook), LiveRamp Holdings, Inc. (Pippio), X Corp (Twitter), Wunderkind Corporation (Bounceexchange), and others (the "Third Parties")—to place and/or transmit cookies that track users' website browsing activities and eavesdrop on users' private communications on the Websites.

4.     Contrary to their express rejection of cookies and tracking technologies on the Websites, Defendant nonetheless caused cookies, including the Third Parties' cookies, to be sent to Plaintiffs and other visitors' browsers, stored on their devices, and transmitted to the Third Parties along with user data. These third-party cookies permitted the Third Parties to track and collect data in real time regarding the Websites' visitors' behaviors and communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and geolocation data—including whether a user is located in California.

5.     The Third Parties analyze and aggregate this user data across websites and time for their own purposes and financial gain, including, creating consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; creating audience segments based on shared traits (such as millennials, Californians, tech enthusiasts,

etc.); and performing targeted advertising and marketing analytics. Further, the Third Parties share user data and/or user profiles to unknown parties to further their financial gain.

6.      This type of tracking and data sharing is exactly what the Websites' visitors who clicked or selected the "REJECT" cookies button on the Websites' cookie consent banners, or chose to adjust "Privacy Preferences" to "opt out" of all categories of cookies that sell or share visitors' personal information, sought to avoid. Defendant falsely told users of the Websites that it respected their privacy and that they could avoid tracking and data sharing when they browsed the Websites. Despite receiving notice of consumers' express declination of consent, Defendant defied it and violated state statutes, and tort duties owed to Plaintiffs and those similarly situated users of the Websites.

## THE PARTIES

7.      Plaintiff Brendon Moore is, and was at all relevant times, an individual and resident of San Francisco, California. Plaintiff intends to remain in California and makes his permanent home there.

8.      Plaintiff Daniel Aldana is, and was at all relevant times, an individual and resident of Modesto, California. Plaintiff intends to remain in California and makes his permanent home there.

9.      Plaintiff Hope Kambick is, and was at all relevant times, an individual and resident of Woodlake, California. Plaintiff intends to remain in California and makes her permanent home there.

10.     Defendant Luxottica of America, Inc. is an Ohio corporation with its headquarters and principal place of business in Ohio.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2). The aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and Plaintiffs and Defendant are citizens of different states.

12.     The injuries, damages and/or harm upon which this action is based, occurred or

arose out of activities engaged in by Defendant within, affecting, and emanating from, the State of California. Defendant regularly conducts and/or solicits business in, engages in other persistent courses of conduct in, and/or derives substantial revenue from products and services provided to persons in the State of California. Defendant has engaged, and continues to engage, in substantial and continuous business practices in the State of California.

13.     Further, the Private Communications and data which Defendant causes to be transmitted to Third Parties are routed through servers located in California.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the state of California, including within this District.

15.     Plaintiffs accordingly allege that jurisdiction and venue are proper in this Court.

## TOLLING AND RELATED ARBITRATION PROCEEDINGS

16.     The delayed discovery rule applies to Plaintiffs' claims. Plaintiffs were unaware that even though they rejected or opted out of cookies on the Websites, Defendant caused cookies, including the Third Parties' cookies, to be sent to their browsers, stored on their devices, and transmitted to the Third Parties along with their private user data until they learned of Defendant's privacy violations from counsel. As alleged below, Plaintiffs do not have the expertise to test whether the Websites honored users' requests to reject cookies.

17.     On or about December 5, 2023, Plaintiff Kambick notified Defendant that she alleged that Defendant knowingly (and without consent) caused third-party cookies and corresponding data to be stored on consumers' devices and/or transmitted to third parties when they visit the LensCrafters Website despite consumers' clear rejection of such third-party cookies. Plaintiff Kambick further notified Defendant that she intended to pursue her claims on behalf of herself and other similarly situated class members.

18.     On or about April 27, 2024, Plaintiff Aldana notified Defendant that he alleged that Defendant knowingly (and without consent) caused third-party cookies and corresponding data to be stored on consumers' devices and/or transmitted to third parties when they visit the

Websites despite consumers' clear rejection of such third-party cookies. Plaintiff Aldana further notified Defendant that he intended to pursue his claims on behalf of himself and other similarly situated class members.

19.     The LensCrafters Website's Terms of Use ("TOU") contains an arbitration agreement that purports to require all LensCrafters Website visitors to arbitrate their disputes with Defendant before the American Arbitration Association ("AAA").

20.     On August 12, 2024, Plaintiff Kambick filed a demand for arbitration in San Francisco with AAA against Defendant. *See* Ex. A. Plaintiff Kambick's claims in the arbitration arose from the same conduct alleged herein.

21.     Arbitrator Ken Korea was assigned as the arbitrator.

22.     Following an preliminary hearing on February 3, 2025, the Arbitrator entered a scheduling order that ordered briefing regarding arbitrability of the underlying dispute.

23.     A hearing on the Motion Regarding Arbitrability was held on May 6, 2025.

24.     On May 29, 2025, Arbitrator Korea issued an Order holding that Plaintiff Kambick's claims were not subject to arbitration. Specifically, the Arbitrator found that Plaintiff Kambick did not agree to the TOU; Plaintiff Kambick did not have actual or constructive notice of the TOU; Defendant's TOU browsewrap agreement is unenforceable; and that Plaintiff Kambick's claims were not arbitrable. *See* Ex. B.

25.     Despite exercising reasonable diligence, Plaintiffs were unaware of Defendant's fraudulent and unlawful conduct alleged herein due to its active concealment of material facts, which prevented Plaintiffs from discovering their claims sooner. Further, Plaintiff Kambick's claims were equitably tolled by her demand letter and her filing of the arbitration proceeding because Defendant had notice of the claims (and her intent to pursue them in court as a putative class action). Defendant was not prejudiced in its ability to gather evidence for Plaintiffs' claims since the claims asserted in this Complaint are substantially similar to those asserted in Plaintiff Kambick's demand letter and her arbitration proceeding. These extraordinary circumstances, including Defendant's intentional misrepresentations and Plaintiff Kambick's pursuit of her

claims in the arbitration proceeding, warrant tolling of the statute of limitations to allow Plaintiffs to pursue their claims in this forum. Plaintiffs acted in good faith and engaged in reasonable conduct in filing the Complaint in this action.

## SUBSTANTIVE ALLEGATIONS

### A.     Defendant Programmed the Websites to Include Third-Party Resources that Utilize Cookie Trackers.

26.     Every website, including the Websites, is hosted by a server that sends and receives communications in the form of HTTP requests, such as "GET" or "POST" requests, to and from Internet users' browsers. For example, when a user clicks on a hyperlink on the Website, the user's browser sends a "GET" request to the Website's server. The GET request tells the Website server what information is being requested (e.g., the URL of the webpage being requested) and instructs the Website's server to send the information back to the user (e.g., the content of the webpage being requested). When the Website server receives an HTTP request, it processes that request and sends back an HTTP response. The HTTP request includes the client's IP address so that the Website server to knows where to send the HTTP response.

27.     An IP address (Internet Protocol address) is a unique numerical label assigned to each device connected to a network that uses the Internet Protocol for communication, typically expressed as four sets of numbers separated by periods (e.g., 192.168.123.132 for IPv4 addresses). IP addresses can identify the network a device is on and the specific device within that network. Public IP addresses used for internet-facing devices reveal geographical locations, such as country, city, or region, through IP geolocation databases.

28.     As a result, Defendant knew that the devices used by Plaintiffs and Class members to access the Website were located in California.

29.     Defendant voluntarily integrated "third-party resources" from the Third Parties into its Websites' programming. "Third-party resources" refer to tools, content or services provided by third-parties, such as analytics tools, advertising networks, or payment processors, that a website developer utilizes by embedding scripts, styles, media, or application

programming interface (API) into the website's code. Defendant's use of the third-party resources on the Websites is done so pursuant to agreements between Defendant and those Third Parties.

30.    The Websites cause users' devices to store and/or transmit both first-party and third-party tracking cookies. Cookies are small text files sent by a website server to a user's web browser and stored locally on the user's device. As described below, cookies generally contain a unique identifier which enables the website to recognize and differentiate individual users. Cookie files are sent back to the website server along with HTTP requests, enabling the website to identify the device making the requests, and to record a session showing how the user interacts with the website.

31.    First-party cookies are those that are placed on the user's browser directly by the web server with which the user is knowingly communicating (in this case, the Websites' servers). First-party cookies are used to track users when they repeatedly visit the same website.

32.    A third-party cookie is set by a third-party domain/webserver (e.g., omtrdc.net, google-analytics.com, www.facebook.com, pippio.com, syndication.twitter.com, api.bounceexchange.com, etc.). When the user's browser loads a webpage (such as a webpage of any of the Websites) containing embedded third-party resources, the third-parties' programming scripts typically issue HTTP commands to determine whether the third-party cookies are already stored on the user's device and to cause the user's browser to store those cookies on the device if they do not yet exist. Third-party cookies include an identifier that allows the third-party to recognize and differentiate individual users across websites (including the Websites) and across multiple browsing sessions.

33.    As described further below, the third-party cookies stored on and/or loaded from users' devices when they interact with the Websites are transmitted to those third parties, enabling them to surreptitiously track in real time and collect users of the Websites' personal information, such as their browsing activities and private communications with Defendant, including the following:

- **Browsing History**: Information about the webpages a Website user visits, including the URLs, titles, and keywords associated with the webpages viewed, time spent on each page, and navigation patterns;

- **Visit History**: Information about the frequency and total number of visits to the Website;

- **Website Interactions:** Data on which links, buttons, or ads on the Website that a user clicks;

- **User Input Data**: The information the user entered into the Website's form fields, including search queries, the user's name, age, gender, email address, location, and/or payment information;

- **Demographic Information**: Inferences about age, gender, and location based on browsing habits and interactions with Website content;

- **Interests and Preferences**: Insights into user interests based on the types of Website content viewed, products searched for, or topics engaged with;

- **Shopping Behavior**: Information about the Website products viewed or added to shopping carts;

- **Device Information**: Details about the Website user's device, such as the type of device (mobile, tablet, desktop), operating system, and browser type;

- **Referring URL**: Information about the website that referred the user to the Website;

- **Session Information**: Details about the user's current Website browsing session, including the exact date and time of the user's session, the session duration and actions taken on the Website during that session;

- **User Identifiers**: A unique ID that is used to recognize and track a specific Website user across different websites over time; and

- **Geolocation Data**: General location information based on the Website user's IP address or GPS data, if accessible, including whether the user is located in California.

(Collectively, the browsing activities and private communications listed in the bullet points above shall be referred to herein as "Private Communications").

34.    Third-party cookies can be used for a variety of purposes, including (i) analytics (e.g., tracking and analyzing visitor behavior, user engagement, and effectiveness of marketing campaigns); (ii) personalization (e.g., remembering a user's browsing history and purchase preferences to enable product recommendations); (iii) advertising/targeting (e.g., delivering targeted advertisements based on the user's consumer profile (i.e., an aggregated profile of the user's behavior, preferences, and demographics); and (iv) social media integration (e.g., enabling sharing of users' activities with social media platforms). Ultimately, third-party cookies are utilized to boost the Websites' performance and revenue through the collection, utilization, and dissemination of user data—including whether a user is located in California.

35.    Defendant specializes in vision care products. Defendant's brands include Oakley, Ray-Ban, Oakley, Persol, and Oliver Peoples (among many others). Defendant operates multiple retail chains, including LensCrafters, Sunglass Hut, and Pearle Vision. Defendant also owns and operates the Websites, which allow visitors to receive information about its products and purchase products. As they interact with the Websites (e.g., by entering data into forms, clicking on links, and making selections), users of the Website communicate Private Communications to Defendant, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and geolocation data—including whether a user is located in California.

36.    Defendant chose to install or integrate its Websites with resources from the Third Parties that, among other things, use cookies. Thus, when consumers visit the Websites, both

first-party cookies and third-party cookies are placed on their devices and/or transmitted. This is caused by software code that Defendant incorporates into its Websites, or that Defendant causes to be loaded. Because Defendant controls the software code of its Websites, and is capable of determining whether a user is accessing the Website from California, it has complete control over whether first-party and third-party cookies are placed on its California users' devices and/or transmitted to third parties.

37.    Defendant explained the third-party cookies it used on the Websites as follows in its Privacy Policy, which is substantially similar across the Websites:

We may use the following types of Cookies:

**Strictly Necessary Cookies**
These Cookies are necessary for the website to function and cannot be switched off in our systems. They are usually only set in response to actions made by you which amount to a request for services, such as setting your privacy preferences, logging in or filling in forms. You can set your browser to block or alert you about these Cookies, but some parts of the Sites will not then work. These Cookies do not store any personally identifiable information.

**Performance Cookies**
These Cookies allow us to count visits and traffic sources so we can measure and improve the performance of our Sites. They help us to know which pages are the most and least popular and see how visitors move around the Sites. If you do not allow these Cookies we will not know when you have visited our Sites and will not be able to monitor its performance. We use Google Analytics, a web analytics service provided by Google, Inc.

**Functional Cookies**
These Cookies enable the website to provide enhanced functionality and personalization. They may be set by us or by third party providers whose services we have added to our pages. If you do not allow these Cookies, then some or all of the Services may not function properly.

**Targeting Cookies**
These Cookies may be set through our Sites by our advertising partners. They may be used by those companies to build a profile of your interests and show you relevant advertisements on other websites. If you do not allow these Cookies, you will experience less targeted advertising.

**Social Media Cookies**
These Cookies are set by a range of social media services that we have added to the Sites to enable you to share our content with your friends and networks. They

are capable of tracking your browser across other websites and building a profile of your interests. This may impact the content and messages you see on other websites you visit. If you do not allow these Cookies, you may not be able to use or see these sharing tools. [3]

38.     Further, Defendant explained its use of "DIGITAL ADVERTISING & ANALYTICS/INTEREST-BASED ADS" in the following section of its Privacy Policy:

We may partner with ad networks and other ad serving providers ("Advertising Providers") that serve ads on behalf of us and others on the Platforms and non-affiliated platforms. Some of those ads may be personalized, meaning that they are intended to be relevant to you based on information Advertising Providers collect about your use of the Platforms and other sites or apps over time, including information about relationships among different browsers and devices ("Interest-based Advertising").

…

Advertising Providers may use data collected in connection with our advertising campaigns for the following purposes:

- For measurement and insight reporting (to produce and provide us with reports measuring the impact and performance of our advertising campaigns).
- To produce benchmarking reports to share with their other customers, but such benchmarking reports will not identify you.
- To target our ad campaigns to specific groups of individuals having particular characteristics.
- To improve and optimize advertising services (for example, to support the objectives of our ad campaigns, improve the effectiveness of their own advertising services and determine the relevance of ads to individuals).
- To personalize ads that the Advertising Providers show, including to enhance user profiles with inferred interests.
- For their internal purposes, including (i) to promote and ensure the safety and security on and of their products and services; (ii) to detect and prevent malicious, deceptive, fraudulent, invalid or illegal activity; (iii) for research and development purposes; and (iv) to maintain the integrity of and to improve their products and services.
- To combine it with other data collected by Advertising Providers in order to provide greater insights in respect of our advertisements.

---

[3] Defendant's Oakley Website Privacy Policy (updated January 7, 2024) (previously available at https://www.oakley.com/en-us/legal/privacy-policy) and similar LensCrafters Website Privacy Policy (updated September 12, 2023) (available at https://www.lenscrafters.com/lc-us/privacy-policy) (both of which, as used in this Complaint, are the "Privacy Policy"). Defendant has since updated its Privacy Policy but, on information and belief, this version is in effect at the time of Plaintiffs' rejection of cookies on the Oakley and LensCrafters Websites.

CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

We may also work with service providers that collect data about your use of the Sites and other sites or apps over time for non-advertising purposes subject to their privacy policies. We use analytics providers such as Google Analytics to gather and analyze aggregated anonymous user information. For more information about Google Analytics, please visit www.google.com/policies/privacy/partners/.

…

We use web analytics tools to enhance user experience by optimizing the efficiency, design, and quality of the Platforms. Our analytics tools use cookies and similar technologies to collect and analyze information related to user behavioral metrics on the Platforms, such as mouse movements, clicks, user inputs, scrolling, access time, visit duration, pages viewed, IP address (including approximate location), operating system, and page reloading. These tools provide insight into what works and what doesn't work for users of the Platforms and they allow us to, for example, identify and repair technical errors such as broken links that impair the Platforms' functionality. The web analytics tools also help us reconstruct the user experience to better understand, for example, where users may be encountering frustration or impediments to using the Platforms.

We use a website analytics tool that provides session replay, heatmaps, funnels, form analytics, feedback campaigns, and similar features/functionality. This session replay software may record your clicks, mouse movements, scrolling, form fills (keystrokes) in non-excluded fields, pages visited and content, time on site, browser, operating system, device type (desktop/tablet/phone), screen resolution, visitor type (first time/returning), anonymized IP address, location (city/country), language, and similar metadata. This software does not collect information on pages where it is not installed, nor does it track or collect information outside your web browser.

We use this web-based analytics software because it gives us a tool to track the online behavior of visitors while on the Platforms and lets us replay visitors' actions. This tool gives us the opportunity to make the Platforms better and, in turn, provide you with an enhanced online experience as well. Thanks to this tool, we are able to gain insight on how you and other visitors use the Platforms; for example, whether you can easily locate the "Find a Store" page or whether it takes multiple clicks to get to that page. Information about these small choices and interactions are of paramount value to us, as they can easily make your experience better and more intuitive and, more importantly, allow us to provide you with a more seamless, customer-friendly e-shopping experience while on the Platforms. For more information on this session replay software, see Contentsquare's Privacy Policy at https://contentsquare.com/privacy-center/privacy-policy/.

We may use pixel tags (also known as web beacons and clear GIFs) to, among other things, track the actions of users of the Services (including email recipients), measure the success of our marketing campaigns, and compile statistics about

- 16 -

usage of the services and response rates. Our Advertising Providers may use pixel tags to collect information for the purposes described above.

*Id.*

**B.**    **Defendant Falsely Informed Users That They Could "REJECT" the Websites' Use of Cookies**

39.    When Plaintiffs and other consumers in California visited the Websites, each of the Websites immediately displayed to them a popup cookie consent banner. As shown in the screenshot below of the Oakley Website, the cookie consent banner stated, "Luxottica of America and our third-party partners use cookies, script code, and other technologies to collect data, monitor your interactions on our site, and/or advertise to you. By clicking 'Accept All Cookies,' you consent to such use." The banner then purported to provide users the opportunity to reject cookies by clicking the button labeled "REJECT," as shown in the following screenshot from the Oakley Website (which has been stretched to enhance readability):



40.    The same or substantially similar popup cookie consent banner appeared on each of the Websites—except the LensCrafters Website differed as addressed in Section C below.

41.    Plaintiffs and other users of the Websites who either clicked or selected the "REJECT" button, indicating their choice and/or agreement to decline or reject all cookies and tracking technologies in use on the Websites, including those used to "collect data, monitor your interactions on our site, and/or advertise to you," could then continue to browse the Websites, and the popup cookie consent banner disappeared.

42.    Defendant's popup cookie consent banner led Plaintiffs, and all those users of the Websites similarly situated, to believe that they declined or rejected all cookies and tracking technologies, especially those that used to "collect data, monitor your interactions on our site, and/or advertise to you[.]" The banner further reasonably led Plaintiffs and those users of the

Websites similarly situated to believe that Defendant would not allow third parties, through cookies, to access their Private Communications with the Websites, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, upon clicking or selecting the "REJECT" cookies button. Defendant's representations, however, were false.

43.    In truth, Defendant did not abide Plaintiffs' or by its other users' wishes. Even though Defendant received notice that certain users, through their selection of the "REJECT" button did not consent to the placement or transmission of third-party cookies that would allow those parties to obtain their Private Communications with the Websites, Defendant nonetheless caused the Third Party tracking cookies to be placed on Website users' browsers and devices and/or transmitted to the Third Parties along with user data—*even for those users who elected to reject all cookies.*

44.    In particular, when Plaintiffs and other Website users clicked or selected the "REJECT" button, Defendant nonetheless continued to cause the Third Parties' cookies to be placed on users' devices and/or transmitted to the Third Parties along with user data, enabling them to collect user data in real time that discloses Website visitors' Private Communications, including browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and geolocation data. In other words, even when consumers like Plaintiffs tried to protect their privacy by rejecting cookies, Defendant failed to prevent cookies from being transmitted to Third Parties, enabling them to track user behavior and communications.

45.    Some aspects of the operations of the Third-Party cookies on the Websites can be observed using specialized tools that log incoming and outgoing network transmissions. The following screenshots, obtained using one such tool, show examples of Third-Party cookies

CLASS ACTION COMPLAINT

being transmitted from an Oakley Website user's device and browser to Third Parties even after

the user clicked the "REJECT" button on the Oakley Website's popup cookie consent banner:



CLASS ACTION COMPLAINT



46.     The screenshots above show the "Network" tab of Chrome Developer Tools, which contains a list of HTTP network traffic transmissions between the user's browser and various third party websites while the user visited and interacted with Defendant's Websites at https://www.oakley.com. The screenshots depict only network traffic occurring *after* the user rejected all cookies using the cookie banner. As shown above, despite the user's rejection of all cookies, the user's interactions with the Oakley Website caused the user's browser to make a large number of GET and POST HTTP requests to third party web domains like google-analytics.com, pippio.com and others. As further shown in the right-hand column of the screenshots, the user's browser sent cookies along with those HTTP requests to the third parties. These screenshots demonstrate that the Oakley Website caused third-party cookie data and users' Private Communications to be transmitted to Third Parties, even after consumers declined or rejected all cookies and tracking technologies by clicking or selecting the "REJECT" button. All of these network calls are made to the Third Parties without the user's knowledge, and despite the user's rejection of all cookies.

47.     The other Websites similarly cause consumers' devices to transmit user data to third parties—even after consumers *reject cookies* by clicking or selecting the "Reject" button— on those Websites.

48.    The Private Communications of Plaintiffs and other users of the Websites, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and geolocation data, were surreptitiously obtained by the Third Parties via these cookies.

49.    As users interact with the Websites, even after clicking or selecting the "REJECT" button, thereby declining or rejecting the use of cookies and similar technologies for collecting data, monitoring website interactions, and/or targeting advertising, more data regarding users' behavior and communications are sent to third parties, alongside the cookie data. The third-party cookies that Defendant wrongfully allows to be stored on users' devices and browsers, and to be transmitted to the Third Parties, cause the Third Parties to track and collect data on users' behaviors and communications, including Private Communications, on the Websites. Because third-party cookies cause the Third Parties to track users' behavior across the Internet and across time, user data can be correlated and combined with other data sets to compile comprehensive user profiles that reflect consumers' behavior, preferences, and demographics (including psychological trends, predispositions, attitudes, intelligence, abilities, and aptitudes). These Third Parties monetize user profiles for advertising, sales, and marketing purposes to generate revenue and target advertising to Internet users. Advertisers can gain deep understanding of users' behavioral traits and characteristics and target those users with advertisements tailored to their consumer profiles and audience segments.

50.    The Third Party code that the Websites cause to be loaded and executed by the user's browser becomes a wiretap when it is executed because it causes the Third Parties—separate and distinct entities from the parties to the conversations—to use cookies to eavesdrop upon, record, extract data from, and analyze conversations to which they are not parties. When the Third Parties use their respective wiretaps on users of the Websites' Private Communications, the wiretaps are not like tape recorders or "tools" used by one party to record the other. The Third Parties each have the capability to use the contents of conversations they

collect through their respective wiretaps for their own purposes as described in more detail below.

**C.   Defendant Also Falsely Informed Users That They Could "Opt Out" of the Cookies that Share or Sell Users' Personal Information.[4]**

51.    Like the popup cookie consent banner on the Oakley Website and Defendant's other Websites, the popup cookie consent banner on the LensCrafters Website similarly informed its users that, "Luxottica of America uses cookies, script code, and other technologies to collect data and/or monitor your interactions on our sites. By proceeding to the site or clicking 'Accept All Cookies', you consent to such use…To manage your selections, please see our **Cookie Manager**[,]" where the phrase "**Cookie Manager**" (emphasis original) was a link users could click or select, as shown in the following screenshot from the LensCrafters Website:



52.    Plaintiff and other Website users who clicked or selected the "Cookie Manager" link on the popup cookie consent banner on the LensCrafters Website were then directed to Defendant's "Privacy Preferences" window.[5] There, Defendant further explained, "We use cookies to personalize content, provide social media features, analyze our traffic and serve ads on our behalf targeted to your interests and based on your online activities. Our use of certain types of cookies is a sale or share of personal information (i.e., targeted advertising) under California and other state laws. To opt out of these activities, slide all three toggles below to the left / off setting and click 'OK.'" Accordingly, users could slide to the "OFF" position those

---

[4] All of Defendant's Websites feature the cookie opt-out process described in this section as an alternative to the use of the "REJECT" button. At the time Plaintiff Kambick chose to opt out of cookies on the LensCrafters Website, there was no "REJECT" button, and the process described here was the primary process on the LensCrafters Website. Defendant has since added a "REJECT COOKIES" button to the LensCrafters Website.

[5] As explained in the footnote above, the "Privacy Preferences" window can be similarly accessed from Defendant's other Websites by clicking the "Cookie Manager" button on the popup cookie consent banner.

CLASS ACTION COMPLAINT

1   toggles for "Analytics", "Social", and "Marketing" cookies, as shown in the screenshot from the

2   LensCrafters Website:



53.     Plaintiff and other users of the LensCrafters Website who adjusted the toggles or

settings available on the Privacy Preferences window to the "OFF" position for all categories of

Analytics, Social, and Marketing cookies indicated their choice and/or agreement to opt out of,

decline, or reject all cookies and tracking technologies in use on the LensCrafters Website, and

on any of Defendant's Websites that featured a Privacy Preferences window similar to that found

on the LensCrafters Website. Users' choice to opt out of all such cookies included those cookies

used to "personalize content, provide social media features, analyze our traffic and serve ads on

our behalf targeted to your interests and based on your online activities[,]" as well as enable the

sale or sharing of users' personal information. Users who confirmed their choices by clicking or

selecting the "OK" button could then continue to browse the LensCrafters Website, as the popup

cookie consent banner and Privacy Preferences window disappeared.

54.     Defendant's popup cookie consent banner and Privacy Preferences window led

Plaintiff Kambick, and all those users of the LensCrafters Website and other Websites similarly

situated, to believe that they had opted out of, declined, or rejected all cookies and tracking technologies, especially those used to "personalize content, provide social media features, analyze our traffic and serve ads on our behalf targeted to your interests and based on your online activities[,]" as well as enable the sale or sharing of users' personal information. The banner further reasonably led Plaintiff Kambick and those users of the LensCrafters Website similarly situated (including users of Defendant's other Websites who opted out of cookies by way of the "Privacy Preferences" window) to believe that Defendant would not allow third parties, through cookies, to access their Private Communications with the LensCrafters Website and other Websites, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, upon adjusting the Analytics, Social, and Marketing toggles to the "OFF" position.

55.    Defendant's representations, however, were false. In truth, Defendant did not abide by Plaintiff Kambick's or other users' wishes. When Plaintiff and other Website users adjusted the Analytics, Social, and Marketing toggles to the "OFF" position, they provided notice to Defendant that they did not consent to the placement or transmission of third-party cookies that would allow those parties to obtain their Private Communications with the Website. Nevertheless, Defendant caused the Third-Party tracking cookies to be placed on Website users' browsers and devices and/or transmitted to the Third Parties along with user data—*even for those users who elected to opt out of all such cookies.*

56.    In particular, when users adjusted the Analytics, Social, and Marketing toggles to the "OFF" position, Defendant nonetheless continued to cause the Third Parties' cookies to be placed on users' devices and/or transmitted to the Third Parties along with user data, enabling them to collect user data in real time that discloses Website visitors' Private Communications, including browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and geolocation data. In other words, even when consumers

like Plaintiff Kambick tried to protect their privacy by opting out of or rejecting all such cookies, Defendant failed to prevent cookies from being transmitted to Third Parties, enabling them to track user behavior and communications.

57.    Some aspects of the operations of the Third-Party cookies on the Websites can be observed using specialized tools that log incoming and outgoing network transmissions. The following screenshots, obtained using one such tool, show examples of Third-Party cookies being transmitted from a LensCrafters Website user's device and browser to Third Parties, even after the user clicked or selected the "Cookie Manager" link on the LensCrafters Website's popup cookie consent banner and adjusted all Analytics, Social, and Marketing toggles to the "OFF" position (then confirmed his or her choices by selecting the "OK" button):



CLASS ACTION COMPLAINT

1

2          58.    The screenshot above shows the "Network" tab of Chrome Developer Tools,

3   which contains a list of HTTP network traffic transmissions between the user's browser and

4   various third-party websites while the user visited and interacted with Defendant's Website at

5   https://www.lenscrafters.com. The screenshot depicts only network traffic occurring **after** the

6   user opted out of all such cookies using the toggles available on the Privacy Preferences window.

7   As shown above, despite the user's choice to opt out of or reject all such cookies, the user's

8   interactions with the LensCrafters Website caused the user's browser to make a large number of

9   GET and POST HTTP requests to third party web domains like www.facebook.com,

10  syndication.twitter.com, api.bounceexchange.com, and others. As further shown in the right-

11  hand column of the screenshot, the user's browser sent cookies along with those HTTP requests

12  to the third parties. This screenshot demonstrates that the LensCrafters Website caused third-

13  party cookie data and users' Private Communications to be transmitted to Third Parties, even

14  after consumers opted out of, declined, or rejected all such cookies and tracking technologies by

15  adjusting all Analytics, Social, and Marketing toggles to the "OFF" position. All of these

16  network calls are made to the Third Parties without the user's knowledge, and despite the user's

17  choice to opt out of all cookies.

18         59.    Defendants' other Websites, all of which have similar opt-out options by way of

19  the Privacy Preferences window, similarly cause consumers' devices to transmit user data to

20  third parties—even after consumers **opt out of all such cookies** by adjusting the available toggles

21  or settings to do so on those Websites.

22         60.    Plaintiff's and other Website users' Private Communications, including their

23  browsing history, visit history, website interactions, user input data, demographic information,

24  interests and preferences, shopping behaviors, device information, referring URLs, session

25  information, user identifiers, and geolocation data, were surreptitiously obtained by the Third

26  Parties via these cookies.

27

28

61.     As users interact with the Websites, even after adjusting all Analytics, Social, and Marketing toggles to the "OFF" position, thereby opting out of, declining, or rejecting the use of cookies and similar technologies for personalized content, providing social media features, analyzing traffic, and serving ads on Defendant's behalf targeted to users' interests and based on users' online activities, more data regarding users' behavior and communications are sent to third parties, alongside the cookie data. The third-party cookies that Defendant wrongfully allows to be stored on users' devices and browsers, and to be transmitted to the Third Parties, cause the Third Parties to track and collect data on users' behaviors and communications, including Private Communications, on the Websites. Because third-party cookies caused the Third Parties to track users' behavior across the Internet and across time, user data can be correlated and combined with other data sets to compile comprehensive user profiles that reflect consumers' behavior, preferences, and demographics (including psychological trends, predispositions, attitudes, intelligence, abilities, and aptitudes). These Third Parties monetize user profiles for advertising, sales, and marketing purposes to generate revenue and target advertising to Internet users. Advertisers can gain deep understanding of users' behavioral traits and characteristics and target those users with advertisements tailored to their consumer profiles and audience segments.

62.     The Third Party code that the Websites cause to be loaded and executed by the user's browser becomes a wiretap when it is executed because it causes the Third Parties—separate and distinct entities from the parties to the conversations—to use cookies to eavesdrop upon, record, extract data from, and analyze conversations to which they are not parties. When the Third Parties use their respective wiretaps on users of the Websites' Private Communications, the wiretaps are not like tape recorders or "tools" used by one party to record the other. The Third Parties each have the capability to use the contents of conversations they collect through their respective wiretaps for their own purposes as described in more detail below.

### D.     The Private Communications Collected As a Result of Third Party Cookies Transmitted When Visiting Defendant's Websites.[6]

#### 1.     The Websites Cause the Interception of the Contents of Communications

63.     The Websites include search bars and forms where users input information. For example, below is a screenshot of the search bar on the Oakley website where users can type into the search bar to cause the Website to search its contents.



64.     The other Websites include a similar search bar that allows users to input a search query and search the website.

65.     When users input the information into the search bar, they are intending to communicate with the Website the contents of the search to receive the information they are interested in.

66.     Instead, the software on the Website causes the contents of the communication to be intercepted while in transit.

67.     For example, the Oakley Website sends consumers' search strings to third parties such as Adobe—even after consumers have rejected all cookies. In the example below, the test string "bifocals" was sent to Adobe along with cookie data, the url of the page the user was viewing, and the user's detailed device and browser information.

---

[6] This section contains multiple references to network calls being made to third parties by consumers' browsers. Unless specifically stated otherwise, all network calls discussed in this section are made **after** consumers have rejected all optional cookies.

CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

https://smetrics.oakley.com/b/ss/lux-oakley/1/JS
fe86f7a3000313598c4bf88a0506f001c06700bd0&fid=11
ttps%3A%2F%2Fwww.oakley.com%2Fen-us%2Fsearch%3Ft
rver=www.oakley.com&zip=94102&events=event5%2Cev
CTiles%26Pages%7C%3ASearch%20Results-Empty%2C%20Pa

**Request** Header  Query  Body  Raw  Summary  +

| Key | Value |
| --- | --- |
| :path | /b/ss/lux-oakley/1/JS-2.25.0/s33459766276198?AQB=1&ndh=1&pf=1&t=5%2F10%2F2024%2014%3A54%3A30%202%20480&vid=0192fe86f7a300031 3598c4bf88a0506f001c06700bd0&fid=114DA92 1607BAF50-308168D81FFB76D5&ce=UTF-8&ns=lu xottica&cdp=2&pageName=%2Fen-us%2Fsearch&g=https%3A%2F%2Fwww.oakley.com %2Fen-us%2Fsearch%3Ftext%3Dbifocals&r=https%3A%2F %2Fwww.oakley.com%2Fen-us%2Fsearch%3Ftext%3Dbifocals&cc=USD&server= www.oakley.com&zip=94102&events=event5%2Cev ent6%2Cevent92&c2=US&c3=PageView%3ALoadin g-Ready&l3=%3ASearch%20Results-Empty%2C%20Pages%2CTiles%26Pages%7C%3AS earch%20Results-Empty%2C%20Pages%2CTiles%26Pages%2Cclick% 20%5BMainNav%20Search%5D%5BSearch%5D&v6 =US&c7=y24%20m11%20d05%20h14%20wTuesda y&v7=y24%20m11%20d05%20h14%20wTuesday& c8=%2Fen-us%2Fsearch%3Ftext%3Dbifocals&v8=%2Fen-us%2Fsearch%3Ftext%3Dbifocals&c9=7742c0d6-ddad-41be-adfa-6accd69b2cc8&v9=7742c0d6-ddad-41be-adfa-6accd69b2cc8&c12=bifocals&c13=bifocals&v 13=0&c14=0&c22=%20%28Windows%20NT%2010 .0%3B%20Win64%3B%20x64%29%20AppleWebKit %2F537.36%20%28KHTML%2C%20like%20Gecko %29%20Chrome%2F130.0.0.0%20Safari%2F537.3 |

6&v22=%20%28Windows%20NT%2010.0%3B%20 Win64%3B%20x64%29%20AppleWebKit%2F537.3 6%20%28KHTML%2C%20like%20Gecko%29%20C hrome%2F130.0.0.0%20Safari%2F537.36&c29=Hy bris&v32=NA&v37=text&c38=%3ASearch%20Result s-Empty%2C%20Pages%2CTiles%26Pages%7C%3AS earch%20Results-Empty%2C%20Pages%2CTiles%26Pages%20click% 20%5BMainNav%20Search%5D%5BSearch%5D&c3 9=Guest&v39=Guest&v40=USD&v44=%3ASearch% 20Results-Empty%2C%20Pages%2CTiles%26Pages&c48=ut4. 51.20241105.1202&v48=ut4.51.20241105.1202&v 49=Hybris&c51=LOCAL%20US&v51=LOCAL%20US &c52=0192fe86f7a3000313598c4bf88a0506f001c 06700bd0&v52=US&c53=1730847111076&v53=E N-US&c54=1920x1080%20z100%20dSD%20oportrait &v54=1920x1080%20z100%20dSD%20oportrait&c 55=O_IA%3DN%7CO_IC%3DN%7CO_IB%3DN%7CP _IA%3DN%7CP_IC%3DN%7CP_IB%3DN&c58=%3A Search%20Results-Empty%2C%20Pages%2CTiles%26Pages&v58=%3 ASearch%20Results-Empty%2C%20Pages%2CTiles%26Pages&c59=des ktop&v59=desktop&c60=%3ASearch%20Results-Empty%2C%20Pages%2CTiles%26Pages&v60=%3 ASearch%20Results-

**CLASS ACTION COMPLAINT**

1

2

3

4

5

6

7

8

9

10

11

Empty%2C%20Pages%2CTiles%26Pages&c61=%3
ASearch%20Results-
Empty%2C%20Pages%2CTiles%26Pages%20click%
20%5BMainNav%20Search%5D%5BSearch%5D&v6
1=%3ASearch%20Results-
Empty%2C%20Pages%2CTiles%26Pages%20click%
20%5BMainNav%20Search%5D%5BSearch%5D&c6
2=1730847111088&v62=1730847111088&c66=E
N&c67=text%3Dbifocals&c68=https%3A%2F%2Fw
ww.oakley.com%2Fen-
us%2Fsearch&v68=https%3A%2F%2Fwww.oakley.c
om%2Fen-
us%2Fsearch%3Ftext%3Dbifoculs&c71=Opt-
Out%20All&c72=2&c74=OO&v74=OO&v80=%3ASe
arch%20Results-
Empty%2C%20Pages%2CTiles%26Pages%20click%
20%5BMainNav%20Search%5D%5BSearch%5D&8
4=Opt-
Out%20All&v89=Search%20MainNav%20Search&v9
1=Unknown&v112=0192fe86f7a3000313598c4bf8
8a0506f001c06700bd0&v113=1730847111076&v
126=https%3A%2F%2Fwww.oakley.com%2Fen-
us%2Fsearch%3Ftext%3Dbifocals&v165=%2Fen-
us%2Fsearch&s=1920x1080&c=24&j=1.6&v=N&k=Y
&bw=801&bh=953&AQE=1

68.    The Websites also offer a feature that allows a user to search for where products are sold. Below is an example of the search results of inputting "94111" into the "Find a Location" search bar on the Oakley Website:



The other Websites offer the feature that allows users to search for where products are sold by allowing users to input data into the location search bar. On information and belief, the Websites also cause information input by users on the location search that is intended to be sent to the Website to be intercepted in a similar fashion as search queries, as described above.

- 30 -

1

2      **2.    Adobe Cookies (Oakley; LensCrafters; Sunglass Hut; Arnette;
        Contacts Direct; Costa; Essilor; Foster Grant; Glasses.com; Native
3       Eyewear; Oliver Peoples; Pearle Vision; Persol; Ray-Ban; Readers;
        Target Optical; and Vogue Eyewear Websites)**

4           69.    With respect to at least the Oakley, LensCrafters, Sunglass Hut, Arnette, Contacts

5   Direct, Costa, Essilor, Foster Grant, Glasses.com, Native Eyewear, Oliver Peoples, Pearle

6   Vision, Persol, Ray-Ban, Readers, Target Optical, and Vogue Eyewear Websites, Defendant

7   causes third party cookies to be transmitted to and from users' browsers and devices when they

8   visit the Websites, even after users elect to reject or opt out of cookies, to and from the

9   **omtrdc.net** domain, associated with Adobe Inc.'s Audience Manager, a data management

10  platform, Adobe's Marketing Cloud, and Adobe's Experience Cloud Identity Service, a service

11  which provides a universal, persistent ID to identify visitors across all Adobe products.

12          70.    These cookies are used to assign a unique identifier to each site visitor, which

13  enables Adobe to consistently recognize and track users across different sessions and domains

14  (i.e., cross-site tracking) and collect and synchronize user data to comprehensively observe and

15  evaluate user behavior online.[7] These cookies enable Adobe to obtain and store at least the

16  following user data: (i) user identifier; (ii) website interactions; (iii) browsing history; (iv) visit

17  history; (v) interests and preferences; and (vi) session information.[8]

18          71.    Adobe aggregates this cookie data with other data from multiple channels and

19  devices, including web analytics, CRM systems, and e-commerce platforms, to create consumer

20  profiles containing detailed information about a consumer's behavior, preferences, and

21

22

23

---

24  [7] *See, e.g.,* Adobe Experience League: Adobe Analytics cookies (available at
    https://experienceleague.adobe.com/en/docs/core-services/interface/data-
25  collection/cookies/analytics); *see also* Adobe Experience League: Audience Manager cookies
    (available at https://experienceleague.adobe.com/en/docs/core-services/interface/data-
26  collection/cookies/audience-manager).

27  [8] *See, e.g.,* Adobe Audience Manager User Guide: Data Collection Components (available at
    https://experienceleague.adobe.com/en/docs/audience-manager/user-guide/reference/system-
28  components/components-data-collection).

CLASS ACTION COMPLAINT

demographics, create audience segments based on shared traits (such as millennials, tech enthusiasts, etc.), and to enable targeted advertising and marketing analytics.[9]

72.    For example, with respect to the Oakley Website, Defendant has configured a subdomain it owns and operates, at smetrics.oakley.com, to point directly to Adobe's endpoint, at oakley.com.ssl.sc.omtrdc.net:[10]





---

[9] *See, e.g.*, Adobe Audience Manager User Guide: Understanding Calls to the Demdex Domain (available at https://experienceleague.adobe.com/en/docs/audience-manager/user-guide/reference/demdex-calls); Adobe Experience Cloud Identity Service overview (available at https://experienceleague.adobe.com/en/docs/id-service/using/intro/overview); Adobe Audience Manager Features (available at https://business.adobe.com/products/audience-manager/features.html); *see also* Audience Manager Overview (available at https://experienceleague.adobe.com/en/docs/audience-manager/user-guide/overview/aam-overview).

[10] Data obtained from https://mxtoolbox.com and https://www.nslookup.io/.

CLASS ACTION COMPLAINT

73.     The omtrdc.net domain is owned and operated by Adobe, and functions as a

tracking server for Adobe Analytics.[11]

74.     When a user visits any of Defendant's Websites, the website code causes multiple

network calls to be made to Adobe throughout the user's visit. For instance, when a user searches

for prescription eyeglasses on the Oakley Website, the Website causes the following type of data

to be sent to Adobe Analytics at oakley.com.ssl.sc.omtrdc.net, via the smetrics.oakley.com

subdomain:

| Request | Header | Query | Body | Form | Cookies | Raw | + |
|---|---|---|---|---|---|---|---|

| Key | ^ | Value |
|---|---|---|
| .a | | |
| .activitymap | | |
| .c | | |
| a. | | |
| aamlh | | 9 |
| activitymap. | | |
| AQB | | 1 |
| AQE | | 1 |
| bh | | 953 |
| bw | | 704 |
| c | | 24 |
| c. | | |
| c14 | | 7 |
| c19 | | direct |
| c2 | | US |
| c20 | | Goggles |
| c22 | | (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/121.0.0.0 Safari/537.36 |
| c29 | | Hybris |
| c3 | | LinkTracking:Event |
| c39 | | Guest |
| c48 | | ut4.51.20240130.1157 |
| c51 | | LOCAL US |
| c53 | | 1706754527448 |
| c54 | | 1920x1080 z100 dSD oportrait |
| c58 | | Goggles:Motocross:Plp-Editorial |
| c59 | | all |
| c62 | | 1706754527463 |
| c66 | | EN |
| c68 | | https://www.oakley.com/en-us/product/W0OO9188 |

[11] *See* https://experienceleague.adobe.com/en/docs/target/using/integrate/a4t/analytics-tracking-server.

CLASS ACTION COMPLAINT

| | |
|---|---|
| c7 | y24 m01 d31 h21 wWednesday |
| c71 | Opt-Out All |
| c72 | 5 |
| c73 | SearchFiltering |
| c74 | OO |
| c8 | /en-us/category/goggles/motocross |
| c9 | 7742c0d6-ddad-41be-adfa-6accd69b2cc8 |
| cc | USD |
| ce | UTF-8 |
| ch | Goggles |
| events | event10,event23 |
| g | https://www.oakley.com/en-us/category/goggles/motocross |
| j | 1.6 |
| k | Y |
| link | APPLY |
| lrt | 125 |
| mcorgid | 125138B3527845350A490D4C@AdobeOrg |
| mid | 52467133545926094822970348395495522614 |
| ndh | 1 |
| ns | luxottica |
| oid | APPLY |
| oidt | 3 |
| ot | SUBMIT |
| page | /en-us/category/goggles/motocross |
| pageIDType | 1 |
| pageName | /en-us/category/goggles/motocross |
| pageType | category |
| pe | lnk_o |
| pev2 | no link_name |
| . | . |

CLASS ACTION COMPLAINT

| | |
|---|---|
| pf | 1 |
| pid | /en-us/category/goggles/motocross |
| pidt | 1 |
| region | filtersOverlay |
| s | 1920x1080 |
| sdid | 52935431F25483F2-7466A29E8B1DD70D |
| server | www.oakley.com |
| t | 31/0/2024 21:31:37 3 300 |
| v | N |
| v113 | 1706754527448 |
| v126 | https://www.oakley.com/en-us/category/goggles/motocross |
| v13 | 7 |
| v165 | /motocross |
| v19 | direct |
| v22 | (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/121.0.0.0 Safari/537.36 |
| v26 | Goggles |
| v32 | NA |
| v39 | Guest |
| v40 | USD |
| v48 | ut4.51.20240130.1157 |
| v49 | Hybris |
| v51 | LOCAL US |
| v52 | US |
| v53 | EN-US |
| v54 | 1920x1080 z100 dSD oportrait |
| v58 | Goggles:Motocross:Plp-Editorial |
| v59 | all |
| v6 | US |
| v62 | 1706754527463 |
| v68 | https://www.oakley.com/en-us/product/W0OO9188?variant=888392279958 |
| v7 | y24 m01 d31 h21 wWednesday |
| v73 | SearchFiltering |
| v74 | OO |
| v8 | /en-us/category/goggles/motocross |
| v84 | Opt-Out All |
| v89 | Plp-Editorial Filters Sort |
| v9 | 7742c0d6-ddad-41be-adfa-6accd69b2cc8 |
| v91 | Unknown |
| zip | 95101 |

CLASS ACTION COMPLAINT

75.     The "mid" parameter is Adobe's unique user identifier that persists across sessions, used to identify a visitor in the Adobe ecosystem.[12]

76.     The "pageName" parameter tells Adobe what page the user is browsing on the Website (here, "/en-us/category/goggles/motocross"). The "ch" channel tells Adobe what channel the user was engaged with (here, "Goggles").

77.     The "bh" and "s" tell Adobe the user's browser height and width in pixel, and the user's screen resolution, respectively.

78.     The "zip" parameter corresponds to the user's zip code.

79.     Defendant's Websites also cause users' search terms to be sent to Adobe. For example, the following data was sent to Adobe when a user searched for the term "bifocals" on the Oakley Website:

_____

[12] *See* https://experienceleague.adobe.com/en/docs/analytics/components/metrics/unique-visitors.

6&v22=%20%28Windows%20NT%2010.0%3B%20
Win64%3B%20x64%29%20AppleWebKit%2F537.3
6%20%28KHTML%2C%20like%20Gecko%29%20C
hrome%2F130.0.0.0%20Safari%2F537.36&c29=Hy
bris&v32=NA&v37=text&c38=%3ASearch%20Result
s-
Empty%2C%20Pages%2CTiles%26Pages%7C%3AS
earch%20Results-
Empty%2C%20Pages%2CTiles%26Pages%20click%
20%5BMainNav%20Search%5D%5BSearch%5D&c3
9=Guest&v39=Guest&v40=USD&v44=%3ASearch%
20Results-
Empty%2C%20Pages%2CTiles%26Pages&c48=ut4.
51.20241105.1202&v48=ut4.51.20241105.1202&v
49=Hybris&c51=LOCAL%20US&v51=LOCAL%20US
&c52=0192fe86f7a3000313598c4bf88a0506f001c
06700bd0&v52=US&c53=1730847111076&v53=E
N-
US&c54=1920x1080&v20z100%20cdSD%20oportrait
&v54=1920x1080&20z100%20oSD%20oportrait&c
55=O_IA%3DN%7CO_IC%3DN%7CO_IB%3DN%7CP
_IA%3DN%7CP_IC%3DN%7CP_IB%3DN&c58=%3A
Search%20Results-
Empty%2C%20Pages%2CTiles%26Pages&v58=%3
ASearch%20Results-
Empty%2C%20Pages%2CTiles%26Pages&c59=des
ktop&v59=desktop&c60=%3ASearch%20Results-
Empty%2C%20Pages%2CTiles%26Pages&v60=%3
ASearch%20Results-

Empty%2C%20Pages%2CTiles%26Pages&c61=%3
ASearch%20Results-
Empty%2C%20Pages%2CTiles%26Pages%20click%
20%5BMainNav%20Search%5D%5BSearch%5D&v6
1=%3ASearch%20Results-
Empty%2C%20Pages%2CTiles%26Pages%20click%
20%5BMainNav%20Search%5D%5BSearch%5D&c6
2=1730847111088&v62=1730847111088&c66=E
N&c67=text%3Dbifocals&c68=https%3A%2F%2Fw
ww.oakley.com%2Fen-
us%2Fsearch&v68=https%3A%2F%2Fwww.oakley.c
om%2Fen-
us%2Fsearch%3Ftext%3Dbifoculs&c71=Opt-
Out%20All&c72=2&c74=OO&v74=OO&v80=%3ASe
arch%20Results-
Empty%2C%20Pages%2CTiles%26Pages%20click%
20%5BMainNav%20Search%5D%5BSearch%5D&v8
4=Opt-
Out%20All&v89=Search%20MainNav%20Search&v9
1=Unknown&v112=0192fe86f7a3000313598c4bf8
8a0506f001c06700bd0&v113=1730847111076&v
126=https%3A%2F%2Fwww.oakley.com%2Fen-
us%2Fsearch%3Ftext%3Dbifocals&v165=%2Fen-
us%2Fsearch&s=1920x1080&c=24&j=1.6&v=N&k=Y
&bw=801&bh=953&AQE=1

80.    Along with this data, the Adobe software code that Defendant causes to be stored on and executed by the user's device causes the following type of cookies to be sent to Adobe:

CLASS ACTION COMPLAINT



CLASS ACTION COMPLAINT

| | |
|---|---|
| bm_sv | DB56AC5690A5DB24B513B798149635DC~YAAQHafLF2PPll+NAQAAu+KBYhbUDRZMU4ZqoaRwJxjSNizB6TrnXUZVUjNeiU3h/Gdf8fZs4n2EcLi7fIdlXPqAtu6NufUdCcJ9044wRlkh0FiDfrH9qQkff3L7IVvPHgwnNvubdiO/Wxs7eFGeZrpflp5FiK1COM1I97SQqlvsCEYhz6zRM/i7eDSSKohDS8SocwPbTQQx6dPvYFcMKLy9FmLf6SOGHe78MF0cSUKWPFhLZY+sbhXhvqCSF9h1Sg==~1 |
| bm_sz | 8D459A9D1012FA96B75542CABFB0764E~YAAQHafLF6D+IV+NAQAAZ0N/Yhb1e+BDenUM1nG/Js2dybyUJbInwPfMgXFGBHaUeBAO3CoLVW4fRf4Ct1IvymaAmICdburbfO9so7Dbs8VxqGVA7GdNKoBCcisLbK/un54Q4f+Lfbf52/pUaIP9IA+6TvopOXx2VYAT1IEKcsdUeOzBUIUfD9r3nSqwpCotN2TwAgXZYxF+L5BGlizha1qyK6i4B9HrbCKNYQ8/vJZCRWOg3+wicBBY3h2FKHABGR/jkxehz0nephbUpFRJeniBMkzpZB8eeg0LI93K9z/jRw2106WrvTdzF865JLHm1L8qDdXsl1S/+Uv9daRBcuXZKvs2IfwtbWYHCK5g+cPlP00ifT9Zx8=~386962~3162691 |
| CONSENTMGR | consent:false%7Cts:1706754561952%7Cc1:0%7Cc2:0%7Cc3:0%7Cc4:0%7Cc5:0%7Cc6:0%7Cc7:0%7Cc8:0%7Cc9:0%7Cc10:0%7Cc11:0%7Cc12:0%7Cc13:0%7Cc14:0%7Cc15:0 |
| forterToken | 13dd54a5bb204d7b99947617a114f5d6_1706754624001__UDF43-m4_20ck |
| ftr_blst_1h | 1706754526949 |
| mt.v | 2.1088130001.1706754525400 |
| s_cc | true |
| s_ecid | MCMID%7C52467133545926094822970348395495522614 |
| s_fid | 08A7F2A134FC628C-26FF274A575B3BDE |
| s_sq | %5B%5BB%5D%5D |
| tealium_data2track_Tags_AdobeAnalytics_TrafficSourceJid_ThisHit | 402014REF |
| tealium_data2track_Tags_AdobeAnalytics_TrafficSourceMid_ThisHit | direct |
| tealium_data_action_lastAction | Goggles:Motocross:Plp-Editorial click [Filters Sort][NEWARRIVALS] |
| tealium_data_action_lastEvent | click [Filters Sort][NEWARRIVALS] |
| tealium_data_session_timeStamp | 1706754527465 |
| tealium_data_tags_adobeAnalytics_trafficSourceJid_stackingInSession | 402011DIR-402012REF-402013REF-402014REF |
| tealium_data_tags_adobeAnalytics_trafficSourceMid_thisSession | direct |
| TrafficSource_Override | 1 |
| utag_main__pn | 4%3Bexp-session |
| utag_main__se | 23%3Bexp-session |
| utag_main__sn | 1 |
| utag_main__ss | 0%3Bexp-session |
| utag_main__st | 1706756496996%3Bexp-session |
| utag_main_ses_id | 1706754527448%3Bexp-session |
| utag_main_vapi_domain | oakley.com |

CLASS ACTION COMPLAINT

81.     According to Adobe documentation, the cookies beginning with "AMCV_..." and "AMCVS_..." are tracking cookies, enabling Adobe to identify the unique user and to track them across other Adobe-integrated websites.[13]

82.     The "s_ecid" cookie is used to store the Experience Cloud ID (ECID) or MID, further enabling Adobe to track the user.[14]

83.     The "s_cc" cookie, set to "true" as it is here, tells Adobe that cookies are enabled.

84.     Further, along with this data, the Adobe software code that Defendant causes to be stored on and executed by the user's device causes the user's "user-agent" information to be sent to Adobe:

| Key | Value |
|-----|-------|
| user-agent | Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/121.0.0.0 Safari/537.36 |

The "user-agent" corresponds to the device and browser that the user has used to access the Website.

85.     Finally, the data sent to Adobe includes the user's IP address.

86.     The above allegations apply equally to all of Defendant's other Websites. In particular, Defendant's other Websites cause substantially the same payload and cookie data to be sent to Adobe, via the following domains:

| Defendant's Website | Defendant's Intermediary Domain | Corresponding Adobe Domain |
|---------------------|----------------------------------|----------------------------|
| arnette.com | smetrics.arnette.com | arnette.com.ssl.sc.omtrdc.net |
| contactsdirect.com | smetrics.contactsdirect.com | contactsdirect.com.ssl.sc.omtrdc.net |
| costadelmar.com | smetrics.costadelmar.com | costadelmar.com.ssl.sc.omtrdc.net |

---

[13] See https://experienceleague.adobe.com/en/docs/id-service/using/intro/cookies
[14] See https://experienceleague.adobe.com/en/docs/core-services/interface/data-collection/cookies/analytics

CLASS ACTION COMPLAINT

| essilor.com | (no intermediary domain) | luxottica.d2.sc.omtrdc.net |
|---|---|---|
| fostergrant.com | (no intermediary domain) | luxottica.d2.sc.omtrdc.net |
| glasses.com | (no intermediary domain) | luxottica.d2.sc.omtrdc.net |
| lenscrafters.com | (no intermediary domain) | luxottica.d2.sc.omtrdc.net |
| nativeyewear.com | (no intermediary domain) | luxottica.d2.sc.omtrdc.net |
| oliverpeoples.com | smetrics.oliverpeoples.com | oliverpeoples.com.ssl.sc.omtrdc.net |
| pearlevision.com | smetrics.pearlevision.com | pearlevision.com.102.122.2o7.net |
| persol.com | smetrics.persol.com | persol.com.ssl.sc.omtrdc.net |
| ray-ban.com | smetrics.ray-ban.com | ray-ban.com.ssl.d2.sc.omtrdc.net |
| readers.com | (no intermediary domain) | luxottica.d2.sc.omtrdc.net |
| sunglasshut.com | smetrics.sunglasshut.com | sunglasshut.com.ssl.sc.omtrdc.net |
| targetoptical.com | (no intermediary domain) | luxottica.d2.sc.omtrdc.net |
| vogue-eyewear.com | smetrics.vogue-eyewear.com | vogue-eyewear.com.ssl.sc.omtrdc.net |

### 3. Google Cookies (Oakley; Costa; Essilor; Eyebuydirect; Foreyes; Foster Grant; Glasses.com; and Pearle Vision Websites)

87. With respect to at least the Oakley, Costa, Essilor, Eyebuydirect, Foreyes, Foster Grant, Glasses.com, and Pearle Vision Websites, Defendant also causes third party cookies to be transmitted to and from Website users' browsers and devices, even after users click or select the "REJECT" button in the cookie banner or adjust toggles to opt out of all Analytics, Social, and Marketing cookies by way of the Privacy Preferences window, to and from at least the **analytics.google.com, google-analytics.com** and/or **doubleclick.net** domains, which are associated with Google LLC's digital advertising and analytics platform that collects user information via cookies to assist Google in performing data collection, behavioral analysis, user

retargeting, and analytics.[15] Google serves targeted ads to web users across Google's ad network, which spans millions of websites and apps. Nearly 20% of web traffic is tracked by Google's DoubleClick cookies.[16] Google's cookies help it track whether users complete specific actions after interacting with an ad (e.g., clicking a link or making a purchase) and provide analytic metrics that advertisers use to measure ad campaign performance. Further, by identifying users who have shown interest in certain products or content, Google's cookies cause its advertising platform to enable advertisers to show relevant ads to those users when they visit other websites within Google's ad network.[17]

88.    Specifically, Google sends cookies when a web user visits a webpage that shows Google Marketing Platform advertising products and/or Google Ad Manager ads.[18] "Pages with Google Marketing Platform advertising products or Google Ad Manager ads include ad tags that instruct browsers to request ad content from [Google's] servers. When the server delivers the ad content, it also sends a cookie. But a page doesn't have to show Google Marketing Platform advertising products or Google Ad Manager ads for this to happen; it just needs to include Google Marketing Platform advertising products or Google Ad Manager ad tags, which might load a click tracker or impression pixel instead." *Id.* As Google explains, "Google Marketing

---

[15] *See* Our advertising and measurement cookies (available at https://business.safety.google/adscookies/).

[16] *See, e.g.* https://www.ghostery.com/whotracksme/trackers/doubleclick.

[17] *See, e.g.* About cross-channel remarketing in Search Ads 360 (available at https://support.google.com/searchads/answer/7189623?hl=en); About dynamic remarketing for retail (available at https://support.google.com/google-ads/answer/6099158?hl=en&sjid=1196213575075458908-NC).

[18] *See* How Google Marketing Platform advertising products and Google Ad Manager use cookies (available at https://support.google.com/searchads/answer/2839090?hl=en&sjid=1196213575075458908-NC); *see also* Cookies and user identification (available at https://developers.google.com/tag-platform/security/concepts/cookies).

CLASS ACTION COMPLAINT

Platform advertising products and Google Ad Manager send a cookie to the browser after any impression, click, or other activity that results in a call to our servers." *Id.*

89.     Google also uses cookies in performing analytical functions. As Google explains, "Google Analytics is a platform that collects data from [] websites and apps to create reports that provide insights into [] business[es]."[19] "To measure a website … [one] add[s] a small piece of JavaScript measurement code to each page on [a] site." *Id.* Then, "[e]very time a user visits a webpage, the tracking code will collect … information about how that user interacted with the page." *Id.* Google Analytics enables website owners to "measure when someone loads a page, clicks a link, [ ] makes a purchase;" "completes a purchase"; "searches [] website or app"; "select content on [] website or app"; "views an item"; and "views their shopping cart."[20]

90.     Google's cookies allow it to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, (v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and (xii) geolocation data—including whether a user is located in California.[21]

---

[19] How Google Analytics Works (available at https://support.google.com/analytics/answer/12159447?hl=en).

[20] Set up events (available at https://developers.google.com/analytics/devguides/collection/ga4/events); and Recommended events (available at https://developers.google.com/analytics/devguides/collection/ga4/events).

[21] *See* About the Google Tag (available at https://support.google.com/searchads/answer/7550511?hl=en); How Floodlight Recognizes Users (available at https://support.google.com/searchads/answer/2903014?hl=en); How Google Ads tracks website conversions (available at https://support.google.com/google-ads/answer/7521212); Google Ads Help, Cookie: Definition (available at https://support.google.com/google-ads/answer/2407785?hl=en); About demographic targeting in Google Ads (available at https://support.google.com/searchads/answer/7298581?hl=en&sjid=1196213575075458908-NC&visit_id=638670675669576522-2267083756&ref_topic=7302618&rd=1); How Google Analytics Works (https://support.google.com/analytics/answer/12159447); Set up events (available at https://developers.google.com/analytics/devguides/collection/ga4/events); and

CLASS ACTION COMPLAINT

91.    For example, when a user browses the eyebuydirect.com Website, the Google software code that Defendant causes to be stored on and executed by the Website user's device causes the following data to be sent to Google's domain, at https://stats.g.doubleclick.com:



92.    Along with this data, the following cookie data is sent to Google:



Recommended events (available at https://support.google.com/analytics/answer/9267735).

93.     Google documentation confirms that the "IDE" cookie is used for advertising. Specifically, it is "used to show Google ads on non-Google sites."[22]

94.     In another example, when a user browses the Oakley Website, the Google software code that Defendant causes to be stored on and executed by the Website user's device causes the following cookie data[23] to be sent to Google's domain, at https://www.google-analytics.com:

| Request | Header | Query | Body | Cookies | Raw | + | |
|---|---|---|---|---|---|---|---|
| **Key** | | | | **Value** | | | |
| _gid | | | | 759442861.1738645066 | | | |
| _r | | | | 1 | | | |
| _s | | | | 1 | | | |
| _slc | | | | 1 | | | |
| _u | | | | aGBAAEIJAAAAACAMI~ | | | |
| _v | | | | j101 | | | |
| a | | | | 1230577143 | | | |
| cid | | | | 532040234.1738645066 | | | |
| de | | | | UTF-8 | | | |
| dl | | | | https://www.oakley.com/en-us/custom-product/0OO9208CP | | | |
| dt | | | | Custom Radar® Ev Sunglasses | Oakley® | Oakley® US | | | |
| gjid | | | | 825449545 | | | |
| je | | | | 0 | | | |
| jid | | | | 1246131720 | | | |
| sd | | | | 30-bit | | | |
| sr | | | | 2240x1260 | | | |
| t | | | | pageview | | | |
| tid | | | | UA-67639213-15 | | | |
| ul | | | | en-us | | | |
| v | | | | 1 | | | |
| vp | | | | 1111x993 | | | |
| z | | | | 1249510950 | | | |

---

[22] https://policies.google.com/technologies/cookies?hl=en-US

[23] Although the parameters are ostensibly sent to Google as "querystring" parameters, Google documentation makes clear that the names of the parameters at issue are identical to Google cookies. *See, e.g.*, https://cheatography.com/dmpg-tom/cheat-sheets/google-universal-analytics-url-collect-parameters; https://www.analyticsmarket.com/blog/how-google-analytics-collects-data; https://www.owox.com/blog/use-cases/google-analytics-client-id.

CLASS ACTION COMPLAINT

95.     The "cid" parameter above refers to "Client ID." It contains a unique identifier for the user's browser and device, that enables Google to link the user to their interactions with the website.[24]

96.     The "t" parameter refers to the hit type, or event that the user has taken. In this case, it is a "pageview"—viewing a specific page on the website. The "dl" and "dt" parameters identify the specific pages.

97.     The "gjid" and "jid" parameters are cross-domain parameters, enabling Google to track the user across multiple domains.

98.     Further, along with all of this data, the Google software code that Defendant causes to be stored on and executed by the user's device causes the user's "user-agent" information to be sent to Google:

```
user-agent                Mozilla/5.0 (Macintosh; Intel Mac OS X
                          10_15_7) AppleWebKit/537.36 (KHTML, like
                          Gecko) Chrome/117.0.0.0 Safari/537.36
```

99.     The "user-agent" corresponds to the device and browser that the user has used to access the Website.

100.    Finally, the data sent to Google contains the user's IP address—which can be used to determine a user's geolocation, including whether they are located in California.

101.    The above allegations apply with equal force to most of Defendant's other websites. The below table shows, at a minimum, the Google websites to which each Website causes cookie data to be sent:

| Defendant Website | Google Website |
|---|---|
| costadelmar.com | doubleclick.net |
| essilor.com | doubleclick.net |

---

[24] *See, e.g.*, https://cheatography.com/dmpg-tom/cheat-sheets/google-universal-analytics-url-collect-parameters; https://www.analyticsmarket.com/blog/how-google-analytics-collects-data; https://www.owox.com/blog/use-cases/google-analytics-client-id.

CLASS ACTION COMPLAINT

| eyebuydirect.com | analytics.google.com; doubleclick.net; google-analytics.com |
|---|---|
| foreyes.com | analytics.google.com; doubleclick.net; google-analytics.com |
| fostergrant.com | doubleclick.net |
| glasses.com | google-analytics.com |
| oakley.com | google-analytics.com |
| pearlevision.com | doubleclick.net |

102.    Because Google's cookies operate across multiple sites (i.e., cross-site tracking), the cookie causes Google to track users as they navigate from one site to another, and to comprehensively observe and evaluate user behavior online. Google's advertising platform aggregates user data to create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics and audience segments based on shared traits (such as females, millennials, etc.), and to perform targeted advertising and marketing analytics.

103.    Thus, the Google cookies used on the Website enable Google to track users' interactions with advertisements to help advertisers understand how users engage with ads across different websites. Further, the user data collected through the cookie enables the delivery of personalized ads based on user interests and behaviors. For instance, if a user frequently visits travel-related websites, Google will show her more travel-related advertisements. Further, the collected data is used to generate reports for advertisers, helping them assess the performance of their ad campaigns and make data-driven decisions (such as renaming their products). Further, Google's advertising platform enables advertisers to retarget marketing, which Google explains allows advertisers to "show previous visitors ads based on products or services they viewed on your website. With messages tailored to your audience, dynamic remarketing helps you build

CLASS ACTION COMPLAINT

leads and sales by bringing previous visitors back to your website to complete what they started."[25]

104.    Further, in its "Shared Data Under Measurement Controller-Controller Data Protection Terms," Google states: "Google can access and analyze the Analytics data customers share with us to better understand online behavior and trends, and improve our products and services—for example, to improve Google search results, detect and remove invalid advertising traffic in Google Ads, and test algorithms and build models that power services like Google Analytics Intelligence that apply machine-learning to surface suggestions and insights for customers based on their analytics data and like Google Ads that applies broad models to improve ads personalization and relevance. These capabilities are critical to the value of the products we deliver to customers today."[26] Thus, Google can have the capability to use the data it collects for understanding online behavior and trends, machine learning, and improving its own products and services.

**4.    Facebook Cookies (LensCraftsters; Costa; Foreyes; and Native Eyewear Websites)**

105.    With respect to at least the LensCrafters, Costa, Foreyes and Native Eyewear Websites, Defendant causes third party cookies to be transmitted to and from Website users' browsers and devices to and from the **facebook.com** domain, even after users click or select the "REJECT" button in the cookie banner or adjust toggles to opt out of all Analytics, Social, and Marketing cookies by way of the Privacy Preferences window. This domain is associated with Meta's digital advertising and analytics platform that collects user information via cookies to assist Meta in performing data collection, behavioral analysis, user retargeting, and analytics.[27] Meta serves targeted ads to web users across Meta's ad network, which spans millions of websites and apps.

---

[25] Dynamic remarketing for web setup guide (available at https://support.google.com/google-ads/answer/6077124).

[26] Shared Data Under Measurement Controller-Controller Data Protection Terms (available at https://support.google.com/analytics/answer/9024351).

[27] https://www.facebook.com/privacy/policies/cookies/.

CLASS ACTION COMPLAINT

1

2

3

4

106.    Cookies help Meta track whether users complete specific actions after interacting with an ad (e.g., clicking a link or making a purchase) and provide analytic metrics that advertisers use to measure ad campaign performance. For example, the Website causes the following data to be sent to Meta when a user views a page on the Foreyes Website:

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

| Key | Value |
| --- | --- |
| GET | https://www.facebook.com/tr/?id=2215599261 m%2Foakley-oo9102-polished-black&if=false& 3079225.1197534557&cs_est=true&ler=other&c |
| **Request** Header **Query** Body Cookies Raw ⎮ Summary + | |
| id | 2215599261836132 |
| ev | PageView |
| dl | https://www.foreyes.com/sunglasses |
| rl | https://www.foreyes.com/oakley-oo9102-polished-black |
| if | false |
| ts | 1706903537788 |
| sw | 1920 |
| sh | 1080 |
| v | 2.9.144 |
| r | stable |
| a | fmc-idimension |
| ec | 0 |
| o | 4126 |
| fbp | fb.1.1706903079225.1197534557 |
| cs_est | true |
| ler | other |
| cdl | API_unavailable |
| it | 1706903537379 |
| coo | false |
| exp | e1 |
| rqm | GET |

CLASS ACTION COMPLAINT

1    107.    The "ev" parameter is an "Event." In this case, the event is a "PageView,"

2    indicating to Facebook that the user has viewed a specific webpage on the Website.

3    108.    The "dl" parameter is the "Document Location." It tells Facebook the specific

4    webpage on which the Event occurred – in this case, https://www.foreyes.com/sunglasses. The

5    "rl" parameter refers to the "Referrer Location," which is the page the user previously visited. In

6    this instance, the referrer location is https://www.foreyes.com/oakley-oo9102-polished-black,

7    identifying the specific product that the user was viewing.

8    109.    The "ts" parameter corresponds to a "Timestamp," and tells Facebook the exact

9    time—down to the millisecond—at which the user viewed the page.

10    110.    The "fbp" parameter is the Facebook Browser ID, and is used to track the user's

11    activity across the Internet.

12    111.    The "sw" and "sh" parameters stand for "screen width" and "screen height," and

13    correspond to the display the user was viewing when the event was recorded.

14    112.    Cookies are sent along with all data transmissions to Meta. For instance, the

15    following cookies were sent along with the "PageView" event:

16

17

18

19

20

21

22

23

24

25

26

27

28

| Key | Value |
| --- | --- |
| ps_n | 0 |
| sb | JIS5ZQLiPCFZkc29-CSsHm2e |
| datr | JIS5ZSTPXESSIUOvbgN7a2K_ |
| c_user | 100076133960803 |
| xs | 36%3AlUcOlbemTksJIg%3A2%3A17066445 22%3A-1%3A-1%3A%3AAcX-AMaBN3dX7HquJuK0Qny5i1ZaWSbZgGD3JqB6zA |
| fr | 1Rf5rtE7VZnfCKhEu.AWXqN-HVnJ1HLzXzVua7HHTatBg.BlvUby.0B.AAA.0.0.BlvUby.AWXBbfXY15A |

CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8

113.    The "c_user" cookie shown above enables Facebook to identify a specific user when they are logged in to their account. The "c_user" cookie stores a user's unique ID, which is associated with their Facebook profile. This ID enables Facebook to track user interactions on its platform and across sites that use Facebook plugins, such as adding items to a cart, clicking "Like" buttons, or engaging with comment sections. When combined with other data sent to the Facebook domain, this cookie allows Meta to track users' browsing activities. Facebook uses this data for various purposes, such as personalizing content, enhancing ad targeting accuracy, and refining its user experience.

9
10
11
12
13

114.    In particular, by identifying users who have shown interest in certain products or content, the facebook.com cookies enable Meta's advertising platform to enable advertisers to show relevant ads to those users when they visit other websites within Meta's ad network.[28] These cookies allow Meta to collect data on how users interact with websites, regardless of whether they have a Facebook account or are logged in.[29]

14
15
16
17
18

115.    The facebook.com cookies allow Meta to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, (v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and (xii) geolocation data (including IP addresses).[30]

19
20
21
22
23
24
25

116.    Meta utilizes the data collected through the facebook.com cookies for its own purposes, including by using the data to tailor content and target advertisements to users. This includes practices such as (i) **Ad Targeting and Retargeting**, in which Meta uses the facebook.com cookie to track users' online behavior across different sites, building a profile based on their browsing habits, purchases, and interactions. This profile enables Facebook to deliver highly targeted ads within the Facebook ecosystem and on other sites that are part of Facebook's Audience Network; (ii) **Conversion Tracking**, in which Meta uses the

26
27
28

[28] *Id.*; https://allaboutcookies.org/what-data-does-facebook-collect.
[29] https://allaboutcookies.org/what-data-does-facebook-collect.
[30] *Id.*

facebook.com cookie to enable business partners to track specific actions users take after viewing or clicking on a Facebook ad, such as making a purchase or signing up for a newsletter; (iii) **Audience Insights and Analytics**, in which Meta uses the facebook.com cookie to provide data to businesses on user demographics, interests, and behaviors across their sites and apps; and (iv) **Cross-Device and Cross-Platform Tracking**, in which Meta uses the facebook.com cookie to support tracking users across devices and platforms, so that ads are targeted consistently regardless of the device a user is on. This ensures that advertisers can follow users across devices.

117.    The above allegations apply to equal force with respect to the LensCrafters, Costa and Native Eyewear Websites, both of which cause cookie data and other data to be sent to Facebook after users have rejected all such cookies.

**5.    Pippio Cookies (Oakley; LensCrafters; Ray-Ban; and Sunglass Hut Websites)**

118.    With respect to at least the Oakley, LensCrafters, Ray-Ban, and Sunglass Hut Websites, Defendant causes third party cookies to be transmitted to and from Website users' browsers and devices, even after users click or select the "REJECT" button in the cookie banner or adjust toggles to opt out of all Analytics, Social, and Marketing cookies by way of the Privacy Preferences window, to and from the **pippio.com** domain.[31] This domain is associated with LiveRamp, a software company that allows businesses to combine customer data from various online and offline sources and leverage that data for marketing and analytics purposes.[32] Pippio.com cookies are used to create an online identification code for the purpose of recognizing users' devices and tracking their user behavior.

119.    These cookies enable LiveRamp to obtain and store at least the following user data: browsing history, visit history, website interactions, user input data (such as email address), demographic information, interests and preferences, device information, user identifiers, and geolocation data (including IP addresses), on the Websites. The unique user identifier enables

---

[31] *See* LiveRamp Product and Service Privacy Notice (available at https://liveramp.com/privacy/service-privacy-policy/).

[32] See https://liveramp.com/privacy/service-privacy-policy/#section1a; *see also* LiveRamp Data Marketplace (available at https://liveramp.com/data-marketplace/).

LiveRamp to sell a user's unique data for use in online and cross-channel advertising (including targeted advertising and email marketing).

120.    LiveRamp explains in its Privacy Notice the user data it receives from pippio cookies installed on "partner websites" and how it uses (and monetizes) that data as follows:

> [The website] partner may sell or share personal information collected from you, such as your email, cookies set on your browser, IP address, or information about your browser or operating system, with LiveRamp. LiveRamp uses this information to create an online identification code for the purpose of recognizing your device. This code may be placed in our partners' cookie and for use in online and cross-channel advertising (including targeted advertising and email marketing), or LiveRamp may connect it to LiveRamp's own 3rd-party cookie and other identifiers. In addition, by associating an email address with a cookie, LiveRamp and third parties can link your browsing activity across different websites and other applications and services to your specific device associated with the email address, identifying the user behind the device. This means that, even when browsing unrelated sites, your online activity can be connected to you for advertising and other marketing-related purposes, including email marketing and offline advertising...
>
> The personal data and identifiers we collect (for instance, a cookie ID) may be linked to other personal data and identifiers through known associations and/or identity resolution (for instance, an identifier derived from or associated with a hashed email address and LiveRamp cookie 1234 might be associated with partner cookie 5678), and shared with advertising partners and other third party advertising companies for the purpose of enabling interest-based content or targeted advertising throughout your online and offline experiences (e.g., web, TV [MVPDs], connected TV, mobile applications, email marketing and other media). These third parties may in turn use this identifier to link demographic or interest-based information you have provided in your interactions with them. Note that LiveRamp does not itself provide the service of targeted advertising (sometimes referred to as "cross-context advertising") but, rather, processes and transfers data to an advertiser's advertising platform so that platform can provide targeted advertising services...[33]

### 6.    Additional Third-Party Cookies

121.    Defendant also causes third party cookies to be transmitted to and from users' browsers and devices on the Websites, even after users elect to reject or opt out of cookies, to and from other domains, including (i) syndication.twitter.com; and (ii) api.bounceexchange.com.

---

[33] *Id.*

122.    The **twitter.com** domain is associated with X Corp, formerly known as Twitter. X Corp's cookies collect a wide range of user data, including a user's browsing history; IP address; interactions with advertisements; data used to authenticate and secure personal accounts; and reading a device's local storage.[34] X Corp uses the collected user data to target users with personalized advertisements and content, generate analytics on website interaction, and to conduct unspecified "Research and Development."[35] At least the LensCrafters and Foreyes Websites cause cookie data and other data to be sent to twitter.com after users have rejected such cookies.

123.    The **bounceexchange.com** domain is associated with Wunderkind Corporation, a company that provides businesses with behavioral marketing and conversion optimization tools. It utilizes using visitor data to increase website conversions through features like exit-intent popups, personalized messaging, and retargeting. Wunderkind uses BounceExchange cookies to track user behavior on websites (such as user actions like page views, clicks, scrolling behavior, time spent on site, and form submissions); personalized offers and messaging (i.e., based on the data collected by the cookies, BounceExchange can trigger personalized pop-ups, overlays, or banners. For example, if a user has visited a site multiple times but has not completed a purchase, the system might show them a special offer or discount to encourage conversion); analytics and reporting (i.e., BounceExchange uses data collected by the cookies to track whether a visitor becomes a customer to allow website owners to analyze which interactions lead to purchases); and user segmentation and targeting (i.e., BounceExchange uses cookies to help businesses retarget users who have shown interest in certain products or services and deliver targeted advertisements to them through other platforms).[36] As Wunderkind explains: "We place our tag and pixel on your site, allowing the Wunderkind Identity Network

---

[34] *See* https://help.x.com/en/rules-and-policies/x-cookies.

[35] *Id.*

[36] *See, e.g.,* Wunderkind Help Center: Conversion Pixel Overview (available at https://support.wunderkind.co/hc/en-us/articles/24664114189339-Conversion-Pixel-Overview); and Wunderkind Help Center: Smart Tag Overview Browser Support (available at https://support.wunderkind.co/hc/en-us/articles/24664130565659-SmartTag-Overview-Browser-Support).

to enhance known customer profiles and identify a significant amount of your anonymized website traffic. We process trillions of events across tens of billions of browsing profiles, giving us an unmatched understanding of consumers. With this robust data available to our AI engine, Wunderkind can scale targeted and personalized email and text sends that drive unrivaled returns for our clients."[37] At least the Oakley, Oliver Peoples, Ray-Ban, Lenscrafters, and Sunglass Hut Websites cause cookie data and other data to be sent to BounceExchange after users have rejected such cookies.

124.    These cookies allow these Third Parties to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) demographic information, (v) interests and preferences, (vi) shopping behaviors, (vii) device information, (viii) referring URLs, (ix) session information, (x) user identifiers, and/or (xi) geolocation data— including whether a user is located in California..

**E.    The Private Communications Collected are Valuable.**

125.    As part of its regular course of business, Defendant targets California consumers by causing the Third Parties to extract, collect, maintain, distribute, and exploit for Defendant's and the Third Parties' profit, all of the Private Communications transferred by the cookies which Defendant causes to be placed on Plaintiff's and other California Website users' devices without their knowledge or consent. Defendant knew the location of consumers like Plaintiffs and the Class members either prior to or shortly after causing the Third Parties to use cookies on their devices.

126.    The Private Communications that the Third Parties track and collect by way of the cookies on the Websites are valuable to Defendant as well as the Third Parties. Defendant can use the data to create and analyze the performance of marketing campaigns, website design, product placement, and target specific users or groups of users for advertisements. For instance, if Defendant wanted to market certain of its Private to consumers, in California, Defendant could use the data collected by the Third Parties to monitor the location of users who visit webpages

---

[37] Wunderkind Performance Marketing (available at https://www.wunderkind.co/how-it-works/performance-marketing-solutions-for-ecommerce/).

related to specific products, then advertise similar products to those particular users when they visit other webpages. As Defendant explained in its Privacy Policy, the data collected by its third-party partners enables Defendant to "improve and optimize advertising services (for example, to support the objectives of our ad campaigns, improve the effectiveness of their own advertising services and determine the relevance of ads to individuals)," among other things. The third-party cookies also enable Defendant to target online advertisements to users when they visit *other* websites, even those completely unrelated to Defendant and its products.

127.    Data about users' browsing history enables Defendant to spot patterns in users' behavior on the Website and their interests in, among other things, Defendant's vision care products. On a broader scale, it enables Defendant to gain an understanding of trends happening across its brands and across the vision care market. All of this helps Defendant further monetize its Website and maximize revenue by collecting and analyzing user data.

128.    The value of the Private Communications tracked and collected by the Third Parties using cookies on the Website can be quantified. Legal scholars observe that "[p]ersonal information is an important currency in the new millennium."[38] Indeed, "[t]he monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend." *Id*. "Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information." *Id*.

129.    Numerous empirical studies quantify the appropriate value measure for personal data. Generally, the value of personal data is measured as either the consumer's willingness to accept compensation to sell her data or the consumer's willingness to pay to protect her information.

130.    Through its false representations and aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties to track users' Private Communications on the Website using third-party cookies, Defendant is unjustly enriching itself at the cost of

---

[38] *See* Paul M. Schwartz, *Property, Privacy and Personal Data*, 117 Harv. L. Rev. 2055, 2056–57 (2004).

consumer privacy and choice, when the consumer could otherwise have the ability to choose if and how they would monetize their data.

## PLAINTIFFS' EXPERIENCES

**Plaintiff Brendon Moore**

131.    During the last year, Plaintiff Moore visited the Oakley Website to browse information about Oakley products on one or more occasions.

132.    Plaintiff Moore's visits to the Website were consistent with a typical Website user's visits seeking information about Defendant's products. Specifically, Plaintiff Moore is not a consumer advocate, a "tester," or a compliance auditor that visited the Website to test or evaluate Defendant's privacy practices.

133.    Specifically, while visiting the Oakley Website, Plaintiff Moore used the search bar feature to search for "glasses" and "tshirts." Plaintiff Moore also accessed products links on the Website by clicking the menu bar indicated by three lines on the upper left corner to expand the options. Plaintiff Moore also clicked the "Sale" link on the Website homepage to browse the products offered at a sale price.

134.    When Plaintiff Moore visited the Oakley Website, the Website immediately detected that he was a visitor in California and presented him with Defendant's popup cookie consent banner, which provided the option to select the "REJECT" cookies button. Plaintiff Moore viewed Defendant's representation on the popup cookie consent banner that, "Luxottica of America and our third-party partners use cookies, script code, and other technologies to collect data, monitor your interactions on our site, and/or advertise to you. By clicking 'Accept All Cookies,' you consent to such use."

135.    Consistent with his typical practice in rejecting or otherwise declining the placement or use of cookies and tracking technologies, Plaintiff Moore selected and clicked the "REJECT" cookies button. Plaintiff Moore believed that selecting the "REJECT" button on the popup cookie consent banner found on the Oakley Website would allow him to opt out of,

decline, and/or reject cookies and other tracking technologies (inclusive of those cookies that "collect data, monitor your interactions on our site, and/or advertise to you").

136.    In selecting the "REJECT" button Plaintiff Moore gave Defendant notice that he did not consent to the use or placement of cookies and tracking technologies while browsing the Oakley Website. Further, Plaintiff Moore specifically rejected, based on Defendant's representations, those cookies used to "collect data, monitor your interactions on our site, and/or advertise to you" and share information with third parties. In reliance on these representations and promises, only then did Plaintiff Moore continue browsing the Oakley Website.

137.    Even before the popup cookie consent banner appeared on the screen, Defendant nonetheless caused cookies and tracking technologies, including those used for collecting data, monitoring interactions on the Websites, and/or targeting advertising, to be placed on Plaintiff Moore's device and/or transmitted to the Third Parties along with user data, without Plaintiff Moore's knowledge. Accordingly, the popup cookie consent banner's representation to Plaintiff Moore that he could reject the use and/or placement of cookies and tracking technologies while he browsed the Website was false. Contrary to what Defendant made Plaintiff Moore believe, he did not have a choice about whether third-party cookies would be placed on his device and/or transmitted to the Third Parties along with his user data; rather, Defendant had already caused that to happen.

138.    Then, as Plaintiff Moore continued to browse the Oakley Website in reliance on the promises Defendant made in the cookie consent banner, and despite Plaintiff Moore's clear rejection of the use and/or placement of such cookies and tracking technologies, Defendant nonetheless continued to cause the placement and/or transmission of cookies along with user data, including those involved in collecting data, monitoring Website interactions, and/advertising, from the Third Parties on his device. In doing so, Defendant permitted the Third Parties to track and collect Plaintiff's Private Communications as Plaintiff Moore browsed the Website.

1

2

3

4

5

6

7

8

9

139.    Defendant's representations that consumers could "Reject" cookies while Plaintiff Moore and users browsed the Oakley Website, or at least those involved in collecting data, monitoring Website interactions, and/advertising, were untrue. Had Plaintiff Moore known this fact, he would not have used the Oakley Website. Moreover, Plaintiff Moore reviewed the popup cookie consent banner prior to using the Oakley Website. Had Defendant disclosed that it would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to reject cookies, Plaintiff Moore would have noticed it and would not have used the Website or, at a minimum, he would have interacted with the Oakley Website differently.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

140.    Plaintiff Moore continues to desire to browse content featured on the Websites. Plaintiff Moore would like to browse websites that do not misrepresent that users can reject cookies and tracking technologies. If the Websites were programmed to honor users' requests to reject cookies and tracking technologies, Plaintiff Moore would likely browse the Websites again in the future, but will not do so until then. Plaintiff Moore regularly visits websites that feature content similar to that of the Websites. Because Plaintiff Moore does not know how the Websites are programmed, which can change over time, and because he does not have the technical knowledge necessary to test whether the Websites honor users' requests to reject cookies and tracking technologies, Plaintiff Moore will be unable to rely on Defendant's representations when browsing the Websites in the future absent an injunction that prohibits Defendant from making misrepresentations on the Websites. The only way to determine what network traffic is sent to third parties when visiting the Websites is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff Moore is not a software developer and has not received training with respect to HTTP network calls.

**Plaintiff Daniel Aldana**

27

28

CLASS ACTION COMPLAINT

141.    Plaintiff Aldana visited the Oakley Website to browse information about Oakley products on one or more occasions during the last four years.

142.    Plaintiff's Aldana's visit to the Website were consistent with a typical Website user's visits seeking information about Defendant's products. Specifically, Plaintiff Aldana is not a consumer advocate, a "tester," or a compliance auditor that visited the Website to test or evaluate Defendant's privacy practices.

143.    Specifically, while visiting the Oakley Website, Plaintiff Alda used the search bar feature to search for prescription glasses. Plaintiff Aldana purchased prescription glasses using the Oakley Website.

144.    When Plaintiff Aldana visited the Oakley Website, the Website immediately detected that he was a visitor in California and presented him with Defendant's popup cookie consent banner, which provided the option to select the "REJECT" cookies button. Plaintiff Aldana viewed Defendant's representation on the popup cookie consent banner that, "Luxottica of America and our third-party partners use cookies, script code, and other technologies to collect data, monitor your interactions on our site, and/or advertise to you. By clicking 'Accept All Cookies,' you consent to such use."

145.    Consistent with his typical practice in rejecting or otherwise declining the placement or use of cookies and tracking technologies, Plaintiff Aldana selected and clicked the "REJECT" cookies button. Plaintiff Aldana believed that selecting the "REJECT" button on the popup cookie consent banner found on the Oakley Website would allow him to opt out of, decline, and/or reject cookies and other tracking technologies (inclusive of those cookies that "collect data, monitor your interactions on our site, and/or advertise to you").

146.    In selecting the "REJECT" button Plaintiff Aldana gave Defendant notice that he did not consent to the use or placement of cookies and tracking technologies while browsing the Oakley Website. Further, Plaintiff Aldana specifically rejected, based on Defendant's representations, those cookies used to "collect data, monitor your interactions on our site, and/or

CLASS ACTION COMPLAINT

advertise to you" and share information with third parties. In reliance on these representations and promises, only then did Plaintiff Aldana continue browsing the Oakley Website.

147.    Even before the popup cookie consent banner appeared on the screen, Defendant nonetheless caused cookies and tracking technologies, including those used for collecting data, monitoring interactions on the Websites, and/or targeting advertising, to be placed on Plaintiff Aldana's device and/or transmitted to the Third Parties along with user data, without Plaintiff Aldana's knowledge. Accordingly, the popup cookie consent banner's representation to Plaintiff Aldana that he could reject the use and/or placement of cookies and tracking technologies while he browsed the Website was false. Contrary to what Defendant made Plaintiff Aldana believe, he did not have a choice about whether third-party cookies would be placed on his device and/or transmitted to the Third Parties along with his user data; rather, Defendant had already caused that to happen.

148.    Then, as Plaintiff Aldana continued to browse the Oakley Website in reliance on the promises Defendant made in the cookie consent banner, and despite Plaintiff Aldana's clear rejection of the use and/or placement of such cookies and tracking technologies, Defendant nonetheless continued to cause the placement and/or transmission of cookies along with user data, including those involved in collecting data, monitoring Website interactions, and/advertising, from the Third Parties on his device. In doing so, Defendant permitted the Third Parties to track and collect Plaintiff's Private Communications as Plaintiff Aldana browsed the Website.

149.    Defendant's representations that consumers could "Reject" cookies while Plaintiff Aldana and users browsed the Oakley Website, or at least those involved in collecting data, monitoring Website interactions, and/advertising, were untrue. Had Plaintiff Aldana known this fact, he would not have used the Oakley Website. Moreover, Plaintiff Aldana reviewed the popup cookie consent banner prior to using the Oakley Website. Had Defendant disclosed that it would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to reject cookies, Plaintiff Aldana would have noticed it and would not

have used the Website or, at a minimum, he would have interacted with the Oakley Website differently.

150.    Plaintiff Aldana continues to desire to browse content featured on the Websites. Plaintiff Aldana would like to browse websites that do not misrepresent that users can reject cookies and tracking technologies. If the Websites were programmed to honor users' requests to reject cookies and tracking technologies, Plaintiff Aldana would likely browse the Websites again in the future, but will not do so until then. Plaintiff Aldana regularly visits websites that feature content similar to that of the Websites. Because Plaintiff Aldana does not know how the Websites are programmed, which can change over time, and because he does not have the technical knowledge necessary to test whether the Websites honor users' requests to reject cookies and tracking technologies, Plaintiff Aldana will be unable to rely on Defendant's representations when browsing the Websites in the future absent an injunction that prohibits Defendant from making misrepresentations on the Websites. The only way to determine what network traffic is sent to third parties when visiting the Websites is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff Aldana is not a software developer and has not received training with respect to HTTP network calls.

**Plaintiff Hope Kambick**

151.    Plaintiff Kambick visited the LensCrafters Website to browse information about LensCrafters products on or around September 2023. She also visited the Sunglasses Hut Website to browse information about Sunglasses Hut products on or around November 2023. She was interested in the sales offered on the Website for sunglasses.

152.    Plaintiff's visits to the Websites were consistent with a typical Website user's visits seeking information about Defendant's products. Specifically, Plaintiff is not a consumer

advocate, a "tester," or a compliance auditor that visited the Website to test or evaluate Defendant's privacy practices.

153.    Specifically, while visiting the LensCraftsters Website, Plaintiff Kambick clicked on the links for various prescription eyeglasses and added some to her cart. She also clicked on the "Offers" link to view the products that Defendant listed for sale pricing. Ultimately, Plaintiff Kambick did not make a purchase on the Website.  While visiting the Sunglasses Hut Website, Plaintiff Kambick looked for the sales offered on the Website.

154.    When Plaintiff Kambick visited the LensCrafters Website, the Website immediately detected that she was a visitor in California and presented her with Defendant's popup cookie consent banner, which provided the option to select or click the "Cookie Manager" link. Plaintiff Kambick viewed Defendant's representation on the popup cookie consent banner that, "Luxottica of America uses cookies, script code, and other technologies to collect data and/or monitor your interactions on our sites. By proceeding to the site or clicking 'Accept All Cookies', you consent to such use…To manage your selections, please see our Cookie Manager."

155.    Likewise, when Plaintiff Kambick visited the Sunglasses Hut Website, the Website immediately detected that she was a visitor in California and presented her with Defendant's popup cookie consent banner, which provided the option to select the "REJECT" cookies button. Plaintiff Kambick viewed Defendant's representation on the popup cookie consent banner that, "Luxottica of America and our third-party partners use cookies, script code, and other technologies to collect data, monitor your interactions on our site, and/or advertise to you. By clicking 'Accept All Cookies,' you consent to such use."

156.    Consistent with her typical practice in managing her cookie selections to reject or otherwise decline the placement or use of cookies and tracking technologies, Plaintiff Kambick selected and clicked the "Cookie Manager" link on the LensCrafters Website, which caused Defendant's "Privacy Preferences" window to appear. There, Plaintiff Kambick saw Defendant's further representation that, "We use cookies to personalize content, provide social media

features, analyze our traffic and serve ads on our behalf targeted to your interests and based on your online activities. Our use of certain types of cookies is a sale or share of personal information (i.e., targeted advertising) under California and other state laws. To opt out of these activities, slide all three toggles below to the left / off setting and click 'OK.'" Plaintiff Kambick saw that she could slide to the "OFF" setting those toggles for "Analytics cookies," "Social cookies," and "Marketing cookies," which she did, confirming her choices by clicking the "OK" button.

157.    Plaintiff Kambick believed that adjusting the toggles on the Privacy Preferences window found on the LensCrafters Website would allow her to opt out of, decline, and/or reject cookies and other tracking technologies (inclusive of those cookies that "personalize content, provide social media features, analyze our traffic and serve ads on our behalf targeted to your interests and based on your online activities").

158.    Likewise, Plaintiff Kambick selected and clicked the "REJECT" cookies button on the Sunglasses Hut Website. Plaintiff Kambick believed that selecting the "REJECT" button on the popup cookie consent banner found on the Sunglasses Hut Website would allow her to opt out of, decline, and/or reject cookies and other tracking technologies (inclusive of those cookies that "collect data, monitor your interactions on our site, and/or advertise to you").

159.    In adjusting toggles to opt out of, decline, and/or reject all such cookies and other tracking technologies on the LensCraftster Website and in clicking the "REJECT" button on the Sunglass Hut Website, Plaintiff Kambick gave Defendant notice that she did not consent to the use or placement of cookies and tracking technologies while browsing the Websites. Further, Plaintiff Kambick specifically rejected, based on Defendant's representations, those cookies used to "personalize content, provide social media features, analyze our traffic and serve ads on our behalf targeted to your interests and based on your online activities" and sell and share her information with third parties for these and other purposes. In reliance on these representations and promises, only then did Plaintiff Kambick continue browsing the Websites.

CLASS ACTION COMPLAINT

160.   Even before the popup cookie consent banner appeared on the screen, Defendant nonetheless caused cookies and tracking technologies, including those used for collecting data, monitoring interactions on the Websites, and/or targeting advertising, to be placed on Plaintiff Kambick's device and/or transmitted to the Third Parties along with user data, without Plaintiff Kambick's knowledge. Accordingly, the popup cookie consent banner's representation to Plaintiff Kambick that she could opt out of the use and/or placement of all such cookies and tracking technologies while she browsed the Websites was false. Contrary to what Defendant made Plaintiff Kambick believe, she did not have a choice about whether third-party cookies would be placed on her device and/or transmitted to the Third Parties along with her user data; rather, Defendant had already caused that to happen.

161.   Then, as Plaintiff Kambick continued to browse the Websites in reliance on the promises Defendant made in the cookie consent banner and Privacy Preferences window, and despite Plaintiff Kambick's clear rejection of the use and/or placement of such cookies and tracking technologies, Defendant nonetheless continued to cause the placement and/or transmission of cookies along with user data, including those involved in collecting data, monitoring Website interactions, and/advertising, from the Third Parties on her device. In doing so, Defendant permitted the Third Parties to track and collect Plaintiff's Private Communications as Plaintiff Kambick browsed the Websites.

162.   Defendant's representations that consumers could reject and/or "opt out" of cookies while Plaintiff Kambick and users browsed the Websites, or at least those involved in collecting data, monitoring Website interactions, and/advertising, were untrue. Had Plaintiff Kambick known this fact, she would not have used the Websites. Moreover, Plaintiff Kambick reviewed the popup cookie consent banner and Privacy Preferences window prior to using the Websites. Had Defendant disclosed that it would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to opt out of cookies, Plaintiff Kambick would have noticed it and would not have used the Websites or, at a minimum, she would have interacted with the Websites differently.

163.    Plaintiff Kambick continues to desire to browse content featured on the Websites. Plaintiff Kambick would like to browse websites that do not misrepresent that users can opt out of cookies and tracking technologies. If the Websites were programmed to honor users' requests to opt out of cookies and tracking technologies, Plaintiff Kambick would likely browse the Websites again in the future, but will not do so until then. Plaintiff Kambick regularly visits websites that feature content similar to that of the Websites. Because Plaintiff Kambick does not know how the Websites are programmed, which can change over time, and because she does not have the technical knowledge necessary to test whether the Websites honor users' requests to reject cookies and tracking technologies, Plaintiff Kambick will be unable to rely on Defendant's representations when browsing the Websites in the future absent an injunction that prohibits Defendant from making misrepresentations on the Websites. The only way to determine what network traffic is sent to third parties when visiting the Websites is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff Kambick is not a software developer and has not received training with respect to HTTP network calls.

## CLASS ALLEGATIONS

164.    Plaintiffs bring this Class Action Complaint on behalf of themselves and a proposed class of similarly situated persons, pursuant to Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure. Plaintiffs seek to represent the following group of similarly situated persons, defined as follows:

**Class**: All persons who browsed any of the Websites in the State of California after clicking or selecting the "REJECT" button in the popup cookies consent banner, inclusive of any similar variations across the Websites (e.g. a "Reject" or "Reject Cookies" button, etc.), or adjusted the toggles in the Website's Privacy Preferences window to opt out of cookies.

165.    This action has been brought and may properly be maintained as a class action against Defendant because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable.

166.    **Numerosity:** Plaintiffs do not know the exact size of the Class, but they estimate that it is composed of more than 100 persons. The persons in the Class are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the courts.

167.    **Common Questions Predominate:** This action involves common questions of law and fact to the Class because each class member's claim derives from the same unlawful conduct that led them to believe that Defendant would not cause third-party cookies to be placed on their browsers and devices and/or transmitted to third parties along with user data, after Class members chose to reject all cookies and tracking technologies on the Websites, nor would Defendant permit third parties to track and collect Class members' Private Communications as Class members browsed the Websites.

168.    The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each member of the Class to recover. The questions of law and fact common to the Class are:

a.    Whether Defendant's actions violate California laws invoked herein; and

b.    Whether Plaintiffs and Class members are entitled to damages, restitution, injunctive and other equitable relief, reasonable attorneys' fees, prejudgment interest and costs of this suit.

169.    **Typicality:** Plaintiffs' claims are typical of the claims of the other members of the Class because, among other things, Plaintiffs, like the other Class members, visited at least one Website (for Plaintiff Moore and Aldana, the Oakley Website and for Plaintiff Kambick, the LensCrafters and Sunglasses Hut Websites), rejected cookies, and had their confidential Private Communications intercepted by the Third Parties.

170.   **Adequacy of Representation:** Plaintiffs will fairly and adequately protect the interests of all Class members because it is in their best interests to prosecute the claims alleged herein to obtain full compensation due to them for the unfair and illegal conduct of which they complain. Plaintiffs also have no interests in conflict with, or antagonistic to, the interests of Class members. Plaintiffs have retained highly competent and experienced class action attorneys to represent their interests and those of the Class. By prevailing on their claims, Plaintiffs will establish Defendant's liability to all Class members. Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiffs and counsel are aware of their fiduciary responsibilities to the Class members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for Class members.

171.   **Superiority:** There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the Class will tend to establish inconsistent standards of conduct for Defendant and result in the impairment of Class members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the damages suffered by each individual member of the Class may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action. Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

CLASS ACTION COMPLAINT

**CAUSES OF ACTION**

**First Cause of Action:**

**Invasion of Privacy Under California's Constitution**

172.    Plaintiffs reallege and incorporate the paragraphs of this Complaint as if set forth herein.

173.    California's constitution creates a right to privacy, and further creates a right of action against private entities such as Defendant.

174.    The principal purpose of this constitutional right is to protect against unnecessary information gathering, use, and dissemination by public and private entities, including Defendant.

175.    Article I, Section 1 of the California Constitution provides:

> "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property and pursuing and obtaining safety, happiness, and privacy."

176.    The phrase "and privacy" was added in 1972 after voters approved a proposed legislative constitutional amendment designated as Proposition 11. Proposition 11 was intended to curb businesses' control over the unauthorized collection and use of peoples' personal information, as the ballot argument stated:

> The right of privacy is the right to be left alone . . . . It prevents government and business interests from collecting and stockpiling unnecessary information about us and from misusing information gathered for one purpose in order to serve other purposes or to embarrass us. Fundamental to our privacy is the ability to control circulation of personal information. This is essential to social relationships and personal freedom.[39]

177.    This amended constitutional provision addresses the concern over accelerating encroachment on personal freedom and security caused by increasing surveillance and data collection activity in contemporary society. Its proponents meant to afford individuals more protection against this most modern threat to personal privacy:

---

[39] Ballot Pamp., Proposed Stats. & Amends. To Cal. Const. With Arguments to Voters. Gen. Election *26 (Nov. 7, 1972).

CLASS ACTION COMPLAINT

1
2
3

Computerization of records makes it possible to create 'cradle-to-grave' profiles of every American. At present there are no effective restraints on the information activities of government and business. This amendment creates a legal and enforceable right of privacy for every Californian.

4

*Id*. In recognizing these privacy rights, the California Constitution provides insight into and

5

serves to define the nature of the reasonable expectation of privacy of an objectively reasonable

6

California resident.

7

178.    To plead a California constitutional privacy claim, Plaintiffs must show an

8

invasion of (i) a legally protected privacy interest; (ii) where Plaintiffs had a reasonable

9

expectation of privacy in the circumstances; and (iii) conduct by Defendant constituting a serious

10

invasion of privacy.

11

179.    Defendant has intruded upon the following legally protected privacy interests of

12

Plaintiffs and Class members: (i) the California Invasion of Privacy Act, as alleged herein;

13

(ii) the California Constitution, which guarantees Californians the right to privacy; (iii) the

14

California Wiretap Acts as alleged herein; (iv) Cal. Penal Code § 484(a), which prohibits the

15

knowing theft or defrauding of property "by any false or fraudulent representation or pretense;"

16

and (v) Plaintiffs' and Class members' Fourth Amendment right to privacy.

17

180.    Plaintiffs and Class members had a reasonable expectation of privacy under the

18

circumstances, as Defendant affirmatively promised users they could "REJECT" or opt out of

19

cookies and tracking technologies before proceeding to browse the Websites. Plaintiffs and other

20

Class members directed their electronic devices to access the Websites and, when presented with

21

the popup cookies consent banner or Privacy Preferences window on the Websites, Plaintiffs and

22

Class members rejected or opted out of cookies and reasonably expected that their rejection of

23

cookies and tracking technologies would be honored. That is, they reasonably believed that

24

Defendant would not permit the Third Parties to store and send cookies and/or use other such

25

tracking technologies on their devices while they browsed the Websites. Plaintiffs and Class

26

members also reasonably expected that, if they rejected such cookies and/or tracking

27

technologies, Defendant would not permit the Third Parties to track and collect Plaintiffs' and

28

Class members' Private Communications, including their browsing history, visit history, website

- 70 -

interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and geolocation data, on the Websites.

181. Such information is "personal information" under California law, which defines personal information as including "Internet or other electronic network activity information," such as "browsing history, search history, and information regarding a consumer's interaction with an internet website, application, or advertisement." Cal. Civ. Code § 1798.140.

182. Defendant, in violation of Plaintiffs' and other Class members' reasonable expectation of privacy, permits the Third Parties to use cookies and other tracking technologies to collect, track, and compile users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and geolocation data—including whether a user is located in California. The data that Defendant allowed third parties to collect enables the Third Parties to (and they in fact do), *inter alia*, create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; create audience segments based on shared traits (such as Millennials, Californians, tech enthusiasts, etc.); and perform targeted advertising and marketing analytics. Further, the Third Parties share user data and/or the user profiles to unknown parties to further their financial gain. The consumer profiles are and can be used to further invade Plaintiffs' and users' privacy, by allowing third parties to learn intimate details of their lives, and target them for advertising and other purposes, as described herein, thereby harming them through the abrogation of their autonomy and their ability to control dissemination and use of information about them.

183. Defendant's actions constituted a serious invasion of privacy in that it invaded a zone of privacy protected by the Fourth Amendment (i.e., one's personal communications), and violated criminal laws on wiretapping and invasion of privacy. These acts constitute an egregious breach of social norms that is highly offensive.

184.    Defendant's intrusion into Plaintiffs' privacy was also highly offensive to a reasonable person in that Defendant violated criminal and civil laws designed to protect individual privacy and against theft.

185.    Defendant lacked a legitimate business interest in causing the placement and/or transmission of third-party cookies along with user data that allowed the Third Parties to track, intercept, receive, and collect Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and geolocation data, without their consent.

186.    Plaintiffs and Class members have been damaged by Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

187.    Plaintiffs and Class members seek appropriate relief for that injury, including but not limited to, damages that will compensate them for the harm to their privacy interests as well as disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiffs' and Class members' privacy.

188.    Plaintiffs and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' rejection of or choice to opt out of the Websites' use of cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

**Second Cause of Action:**

**Intrusion Upon Seclusion**

189.    Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

190.    To assert a claim for intrusion upon seclusion, Plaintiffs must plead (i) that Defendant intentionally intruded into a place, conversation, or matter as to which Plaintiffs had a reasonable expectation of privacy; and (ii) that the intrusion was highly offensive to a reasonable person.

191.    By permitting third-party cookies to be stored on consumers' devices, which caused the Third Parties to track and collect Plaintiffs' and Class members' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and geolocation data, in violation of Defendant's representations otherwise in the popup cookie consent banner, Defendant intentionally intruded upon the solitude or seclusion of users of the Websites. Defendant effectively placed the Third Parties in the middle of communications to which they were not invited, welcomed, or authorized.

192.    The Third Parties' tracking and collecting of Plaintiffs' and Class member's Private Communications on the Websites using third-party cookies that Defendant caused to be stored on users' devices—and to be transmitted to Third Parties—was not authorized by Plaintiffs and Class members, and, in fact, those users of the Websites specifically chose to "REJECT" or opt out of all such cookies.

193.    Plaintiffs and the Class members had an objectively reasonable expectation of privacy surrounding their Private Communications on the Websites based on Defendant's promise that users could "REJECT" or opt out of cookies, as well as state criminal and civil laws designed to protect individual privacy.

194.    Defendant's intentional intrusion into Plaintiffs' and other users' Private Communications would be highly offensive to a reasonable person given that Defendant represented that the Websites' users could "REJECT" or opt out of cookies, when, in fact, Defendant caused such third-party cookies to be stored on consumers' devices and browsers, and to be transmitted to third parties, even when consumers rejected or opted out of all such cookies. Indeed, Plaintiffs and Class members reasonably expected, based on Defendant's false representations, that when they rejected or opted out of cookies and tracking technologies, Defendant would not cause such third-party cookies to be stored on their devices or permit the Third Parties to obtain their Private Communications on the Websites, including their browsing

CLASS ACTION COMPLAINT

history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and geolocation data—including whether a user is located in California.

195.    Defendant's conduct was intentional and intruded on Plaintiffs' and users' Private Communications on the Websites.

196.    Plaintiffs and Class members have been damaged by Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

197.    Plaintiffs and Class members seek appropriate relief for that injury, including but not limited to, damages that will compensate them for the harm to their privacy interests as well as disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiffs' and Class members' privacy.

198.    Plaintiffs and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' rejection of the Websites' use of cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

## **Third Cause of Action:**

**Wiretapping in Violation of the California Invasion of Privacy Act (California Penal Code § 631)**

199.    Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

200.    California Penal Code § 631(a) provides, in pertinent part:

"Any person who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars . . . ."

CLASS ACTION COMPLAINT

201.    The California Supreme Court has repeatedly stated an "express objective" of CIPA is to "protect a person placing or receiving a call from a situation where the person on the other end of the line permits an outsider to tap his telephone or listen in on the call." *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985) (emphasis added).

202.    Further, as the California Supreme Court has held, in explaining the legislative purpose behind CIPA:

> While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and *its simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.*

> As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication— the right to control the nature and extent of the firsthand dissemination of his statements.

*Ribas*, 38 Cal. 3d at 360-61 (emphasis supplied; internal citations omitted).

203.    CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978). Thus, to establish liability under § 631(a), Plaintiffs need only establish that Defendant, "by means of any machine, instrument, contrivance, or in any other manner," did ***any*** of the following:

> [i] Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system;

> [ii] Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state;

> [iii] Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained

Cal. Penal Code § 631(a).

204.    CIPA § 631(a) also penalizes those who [iv] "aid[], agree[] with, employ[], or conspire[] with any person" who conducts the aforementioned wiretapping, or those who "permit" the wiretapping.

205.    Defendant is a "person" within the meaning of California Penal Code § 631.

206.    Section 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *see also Bradley v. Google, Inc.*, 2006 WL 3798134, at *5–6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

207.    The Third Parties' cookies—as well as the software code of the Third Parties responsible for placing the cookies and transmitting data from user devices to the Third Parties— constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA (and, even if they do not, Defendant's deliberate and purposeful scheme that facilitated the interceptions falls under the broad statutory catch-all category of "any other manner").

208.    Each of the Third Parties is a "separate legal entity that offers [a] 'software-as-a-service' and not merely a passive device." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021). Further, the Third Parties had the capability to use the wiretapped information for their own purposes. Accordingly, the Third Parties were third parties to any communication between Plaintiffs and Class members, on the one hand, and Defendant, on the other. *Id.* at 521; *see also Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

209.    Under § 631(a), Defendant must show it had the consent of all parties to a communication.

210.    At all relevant times, the Websites each caused Plaintiffs and Class members' browsers to store the Third Parties' cookies and to transmit those cookies alongside Private Communications—including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and geolocation data—to the

Third Parties even after users expressly rejected cookies. By configuring the Websites in this manner, Defendant willfully aided, agreed with, employed, permitted, or otherwise caused the Third Parties to wiretap Plaintiffs and Class members using the Third Parties' cookies and to accomplish the wrongful conduct alleged herein.

211.    At all relevant times, by their cookies and corresponding software code, the Third Parties willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning of electronic communications of Plaintiffs and Class members, on the one hand, and Defendant, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

212.    The Private Communications of Plaintiffs and Class members, on the one hand, and Defendant, on the other, that the Third Parties intercepted directly communicates users of the Websites' affirmative decisions, actions, choices, preferences, and activities, which constitute the "contents" of electronic communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and geolocation data—including whether a user is located in California.

213.    At all relevant times, the Third Parties used or attempted to use the Private Communications intercepted by their cookie tracking technologies for their own purposes.

214.    Plaintiffs and Class members did not provide their prior consent to the Third Parties' intentional access, interception, reading, learning, recording, collection, and usage of Plaintiffs' and Class members' electronic communications. Nor did Plaintiffs and Class members provide their prior consent to Defendant aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties' conduct. On the contrary, Plaintiffs and Class members expressly declined to allow Third Parties' cookies and tracking technologies to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic communications by choosing to reject cookies in the consent banner.

215.     The wiretapping of Plaintiffs and Class members occurred in California, where Plaintiffs and Class members accessed the Websites and where the Third Parties—as caused by Defendant—routed Plaintiffs' and Class members' electronic communications to Third Parties' servers. Among other things, the cookies, as well as the software code responsible for placing the cookies and transmitting them and other Private Communications to the Third Parties, resided on Plaintiffs' California-located device. In particular, the user's California-based device, after downloading the software code from the Third Parties' servers, (i) stored the code onto the user's disk; (ii) converted the code into machine-executable format; and (iii) executed the code, causing the transmission of data (including cookie data) to and from the Third Parties.

216.     Plaintiffs and Class members have suffered loss by reason of these violations, including, but not limited to, (i) violation of their right to privacy; and (ii) loss of value in their Private Communications.

217.     Pursuant to California Penal Code § 637.2, Plaintiffs and Class members have been injured by the violations of California Penal Code § 631, and each seeks statutory damages of the greater of $5,000, or three times the amount of actual damages, for each of Defendant's violations of CIPA § 631(a), as well as injunctive relief.

218.     Unless enjoined, Defendant will continue to commit the illegal acts alleged herein including, but not limited to, permitting third parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendant. Plaintiffs, Class members, and the general public continue to be at risk because Plaintiffs, Class members, and the general public frequently use the internet to search for information and content related to consumer electronics products. Plaintiffs, Class members, and the general public continue to desire to use the internet for that purpose. Plaintiffs, Class members, and the general public have no practical way to know if their request to reject cookies and tracking technologies will be honored and/or whether Defendant will permit third parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendant. Further, Defendant has already permitted the Third

CLASS ACTION COMPLAINT

Parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendant and will continue to do so unless and until enjoined.

**Fourth Cause of Action:**

**Use of a Pen Register in Violation of the California Invasion of Privacy Act (California Penal Code § 638.51)**

219.    Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

220.    The California Invasion of Privacy Act, codified at Cal. Penal Code §§ 630 to 638, includes the following statement of purpose:

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

221.    California Penal Code Section 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

222.    A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

223.    The Third Parties' cookies and the corresponding software code installed by Defendant on each of the Websites are each "pen registers" because they are "device[s] or process[es]" that "capture[d]" the "routing, addressing, or signaling information"—including, the IP address and user-agent information—from the electronic communications transmitted by Plaintiff's and the Class's computers or devices. Cal. Penal Code § 638.50(b).

224.    At all relevant times, Defendant caused the Third Parties' cookies and the corresponding software code—which are pen registers—to be placed on Plaintiffs' and Class members' browsers and devices, and/or to be used to transmit Plaintiffs' and Class members' IP

address and user-agent information. *See Greenley v. Kochava,* 2023 WL 4833466, at *15-16 (S.D. Cal. July 27, 2023); *Shah v. Fandom, Inc.*, 2024 U.S. Dist. LEXIS 193032, at *5-11 (N.D. Cal. Oct. 21, 2024).

225.    Some of the information collected by the Third Parties' cookies and the corresponding software does not constitute the content of Plaintiffs' and the Class's electronic communications with the Websites. *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1008 (9th Cir. 2014). ("IP addresses constitute addressing information and do not necessarily reveal any more about the underlying contents of communication…") (cleaned up).

226.    Plaintiffs and Class members did not provide their prior consent to Defendant's use of third-party cookies. On the contrary, Plaintiffs and the Class members informed Defendant that they did not consent to the Websites' use of third-party cookies by clicking or selecting the "REJECT" button in the cookie consent banner or by adjusting toggles in the Privacy Preferences window to opt out of all such cookies.

227.    Defendant did not obtain a court order to install or use the third-party cookies to track and collect Plaintiffs' and Class member's IP addresses and user-agent information.

228.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class members suffered losses and were damaged in an amount to be determined at trial.

229.    Pursuant to Penal Code § 637.2(a)(1), Plaintiffs and Class members are also entitled to statutory damages of $5,000 for each of Defendant's violations of § 638.51(a).

**Fifth Cause of Action:**

**Common Law Fraud, Deceit and/or Misrepresentation**

230.    Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

231.    Defendant fraudulently and deceptively informed Plaintiffs and Class members that they could "REJECT" or opt out of cookies.

232.    However, despite Defendant's representations otherwise, Defendant caused third-party cookies and software code to be stored on consumers' devices, and to be transmitted to the Third Parties alongside Private Communications, even after users clicked or selected the

CLASS ACTION COMPLAINT

"REJECT" cookies button in the popup cookie consent banner, or adjusted toggles in the Privacy Preferences window to opt out of all such cookies. These cookies and corresponding software code allowed the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' Private Communications, even when consumers had previously chosen to reject or opt out of all such cookies.

233.    These misrepresentations and omissions were known exclusively to, and actively concealed by Defendant, not reasonably known to Plaintiffs and Class members, and material at the time they were made. Defendant knew, or should have known, how the Websites functioned, including the Third Party's resources it installed on the Websites and the third-party cookies in use on the Websites, through testing the Websites, evaluating its performance metrics by means of its accounts with the Third Parties, or otherwise, and knew, or should have known, that the Websites' programming allowed the third-party cookies to be placed on users'—including Plaintiffs'—browsers and devices and/or transmitted to the Third Parties along with users' Private Communications even after users attempted to "REJECT" or opt out of all such cookies, which Defendant promised its users they could do. Defendant's misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiffs and Class members as to whether to use the Websites. In misleading Plaintiffs and Class members and not so informing them, Defendant breached its duty to Plaintiffs and Class members. Defendant also gained financially from, and as a result of, its breach.

234.    Plaintiffs and Class members relied to their detriment on Defendant's misrepresentations and fraudulent omissions.

235.    Plaintiffs and Class members have suffered an injury-in-fact, including the loss of money and/or property, as a result of Defendant's unfair, deceptive, and/or unlawful practices, including the unauthorized interception of their Personal Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and geolocation data, which have value as demonstrated by the use

and sale of consumers' browsing activity, as alleged above. Plaintiffs and Class members have also suffered harm in the form of diminution of the value of their private and personally identifiable information and communications.

236. Defendant's actions caused damage to and loss of Plaintiffs' and Class members' property right to control the dissemination and use of their personal information and communications.

237. Defendant's representation that consumers could reject or opt out of cookies (including cookies used to "collect data, monitor your interactions on our site, and/or advertise to you" and those that "personalize content, provide social media features, analyze our traffic and serve ads on our behalf targeted to your interests and based on your online activities") if they clicked or selected the "REJECT" cookies button or adjusted settings to opt out of all such cookies was untrue. Again, had Plaintiffs and Class members known these facts, they would not have used the Websites. Moreover, Plaintiffs and Class members reviewed the Websites' popup cookie consent banners (and, for at least the LensCrafters Website, the Privacy Preferences window) prior to their interactions with the Websites. Had Defendant disclosed that it caused third-party cookies to be stored on the Websites' visitors' devices that collect data, monitor interactions on the Websites, and/or target advertising and/or share information with third parties even after they choose to reject or opt out of all such cookies, Plaintiffs and Class members would have noticed it and would not have interacted with the Websites.

238. By and through such fraud, deceit, misrepresentations and/or omissions, Defendant intended to induce Plaintiffs and Class members to alter their positions to their detriment. Specifically, Defendant fraudulently and deceptively induced Plaintiffs and Class members to, without limitation, use the Websites under the mistaken belief that Defendant would not permit third parties to obtain users' Private Communications when consumers chose to reject cookies.

239. Plaintiffs and Class members justifiably and reasonably relied on Defendant's misrepresentations and omissions, and, accordingly, were damaged by Defendant's conduct.

240.    As a direct and proximate result of Defendant's misrepresentations and/or omissions, Plaintiffs and Class members have suffered damages, as alleged above, and are entitled to just compensation, including monetary damages.

241.    Plaintiffs and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' rejection of the Websites' use of cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

**Sixth Cause of Action:**

**Unjust Enrichment**

242.    Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

243.    Defendant created and implemented a scheme to increase its own profits through a pervasive pattern of false statements and fraudulent omissions.

244.    Defendant was unjustly enriched as a result of its wrongful conduct, including through its misrepresentation that users could "REJECT" or opt out of cookies and by permitting the Third Parties to store and transmit cookies on Plaintiffs' and Class members' devices and browsers, which permitted the Third Parties to track and collect users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and geolocation data, even after Class members rejected such cookies.

245.    Plaintiffs and Class members' Personal Communications have conferred an economic benefit on Defendant.

246.    Defendant has been unjustly enriched at the expense of Plaintiffs and Class members, and Defendant has unjustly retained the benefits of its unlawful and wrongful conduct.

247.    Defendant appreciated, recognized, and chose to accept the monetary benefits that Plaintiffs and Class members conferred onto Defendant at their detriment. These benefits were

the expected result of Defendant acting in its pecuniary interest at the expense of Plaintiffs and Class members.

248.    It would be unjust for Defendant to retain the value of Plaintiffs' and Class members' property and any profits earned thereon.

249.    There is no justification for Defendant's enrichment. It would be inequitable, unconscionable, and unjust for Defendant to be permitted to retain these benefits because the benefits were procured as a result of its wrongful conduct.

250.    Plaintiffs and Class members are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs and Class members to the position they occupied prior to having their Private Communications tracked and collected by the Third Parties.

251.    Plaintiffs plead this claim separately, as well as in the alternative, to their other claims, as without such claims Plaintiffs would have no adequate legal remedy.

## **PRAYER FOR RELIEF**

**WHEREFORE**, reserving all rights, Plaintiffs, on behalf of themselves and the Class members, respectfully requests judgment against Defendant as follows:

A.    Certification of the proposed Class, including appointment of Plaintiffs' counsel as class counsel;

B.    An award of compensatory damages, including statutory damages, where available, to Plaintiffs and Class members against Defendant for all damages sustained as a result of Defendant's wrongdoing, including both pre- and post-judgment interest thereon;

C.    An award of punitive damages;

D.    An award of nominal damages;

E.    An order for full restitution;

F.    An order requiring Defendant to disgorge revenues and profits wrongfully obtained;

1        G.      An order temporarily and permanently enjoining Defendant from continuing the

2  unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

3        H.      For reasonable attorneys' fees and the costs of suit incurred; and

4        I.      For such further relief as may be just and proper.

5        Dated: December 19, 2025

**GUTRIDE SAFIER LLP**

*/s/ Seth A. Safier*
  Seth A. Safier (State Bar No. 197427)
    seth@gutridesafier.com
  Marie A. McCrary (State Bar No. 262670)
    marie@gutridesafier.com
  Todd Kennedy (State Bar No. 250267)
    todd@gutridesafier.com
  100 Pine Street, Suite 1250
  San Francisco, CA 94111
  Telephone: (415) 639-9090
  Facsimile:  (415) 449-6469

*Attorneys for Plaintiffs*

CLASS ACTION COMPLAINT

# EXHIBIT A

1  **GUTRIDE SAFIER LLP**
   Seth A. Safier (State Bar No. 197427)
2    seth@gutridesafier.com
   Marie A. McCrary (State Bar No. 262670)
3    marie@gutridesafier.com
   Kali R. Backer (State Bar No. 342492)
4    kali@gutridesafier.com
   100 Pine Street, Suite 1250
5  San Francisco, CA 94111
   Telephone: (415) 639-9090
6  Facsimile: (415) 449-6469

7  *Attorneys for Claimant*

8            **AMERICAN ARBITRATION ASSOCIATION**

9              **SAN FRANCISCO REGIONAL OFFICE**

10 HOPE KAMBICK,                          | Arbitration Case No.

11                        Claimant,       | **COMPLAINT AND DEMAND FOR**
                                          | **ARBITRATION**
12     v.

13 LUXOTTICA OF AMERICA, INC.,

14                        Respondent.

15

16        Claimant Hope Kambick ("Claimant") brings this action against Luxottica of America

17 Inc., d/b/a LensCrafters ("Respondent" or "LensCrafters"). Claimant's allegations against

18 LensCrafters are based upon information and belief and upon investigation of Claimant's counsel,

19 except for allegations specifically pertaining to Claimant, which are based upon Claimant's

20 personal knowledge. Claimant files this Complaint and Arbitration Demand without waiver of

21 any right or argument, specifically, and without limitation, that she did not assent to LensCrafters'

22 website's Terms of Use, including the arbitration agreement contained therein, and/or that the

23 purported arbitration agreement is unlawful and/or unenforceable.

24                          **INTRODUCTION**

25        1.      This Complaint and Arbitration Demand concerns one issue: whether a valid and

26 enforceable arbitration agreement was formed between the parties to cover a separate dispute

27 about Respondent's internet cookie practices that is not part of this Complaint nor at issue in this

28 proceeding. For purposes of context, that underlying dispute relates to Claimant's visit to

---
                          - 1 -

Respondent's website (www.lenscrafters.com, the "Website"), where despite Claimant's agreement with Respondent that it would not place tracking cookies on her device, Respondent proceeded to do so anyway.[1] As is relevant to the instant dispute, the Website's Terms and Conditions ("TOU" or "Terms") contained an arbitration provision purporting to require "any and all disputes or claims" between Website users and Respondent "that relate to or arise from your use of or access to this Website" to be resolved by binding arbitration.[2] Claimant contends that no agreement to arbitrate was ever formed. Accordingly, she filed this arbitration demand to seek a declaration from the arbitrator that her underlying cookie dispute with Respondent is not subject to arbitration.

2.      The Website's TOU are available on the Website but Respondent does not require Website users to read or agree to the Terms before browsing the Website. When Claimant visited the Website, she did not see or otherwise assent to the TOU before choosing to "Reject All" cookies and browse the website. Accordingly, Claimant made no agreement to arbitrate her underlying cookie dispute.

## BACKGROUND ON THE UNDERLYING COOKIE DISPUTE

3.      This underlying dispute in this matter concerns an egregious privacy violation and total breach of consumer trust in blatant violation of California law. The Website is configured to use a multitude of cookies to enable third parties to track users' activity and communications on the Website.

---

[1] Respondent owns other brand websites, including, oakley.com; ray-ban.com; oliverpeoples.com; targetoptical.com; contactsdirect.com; glasses.com; sunglasshut.com; nativeyewear.com; fostergrant.com; pearlevision.com; costadelmar.com; arnette.com; vogue-eyewear.com; and persol.com. Respondent engaged in the same underlying unlawful conduct regarding the placement of internet cookies on each of the websites.

[2] The Website's Terms & Conditions were updated on February 22, 2024 to, *inter alia*, remove the arbitration provision. The Complaint and Demand refers to the version of the Terms & Conditions that were updated on October 21, 2022 which were available on the Website prior to December 5, 2023, the date that Claimant provided Respondent with notice of the underlying cookie dispute.

4.     However, at least until placed on notice by Claimant,[3] the Website presented all visitors immediately with a cookie pop-up banner stating that, rather than accepting all cookies, users can "manage your selections" by visiting the "Cookie Manager."

> Luxottica of America uses cookies, script code, and other technologies to collect data and/or monitor your interactions on our sites. By proceeding to the site or clicking "Accept All Cookies", you consent to such use. For more information, please see our **Privacy Policy** and **Terms of Use**. To manage your selections, please see our **Cookie Manager**.
>
> ACCEPT ALL COOKIES

(Screenshot LensCrafters Website cookie popup banner.)

5.     Users who clicked the "Cookie Manager" link were directed to a "Privacy Preferences" window, where Respondent represented that users could opt out of certain cookies, including Analytics, Social, and Marketing cookies. Thousands of visitors to the Website, including Claimant, did just that—they selected the "Cookie Manager" link, and toggled off cookies to indicate their choice/agreement to reject all cookies, inclusive of those that enable the sale and sharing of their personal data, and then proceeded to browse the Website.

6.     Unbeknownst to Claimant and other users, however, Respondent nonetheless caused cookies—both from Respondent and third parties with notorious privacy records, including, Facebook, X/Twitter, Arbor/Pippio, Affirm, Google, and Wunderkind/BounceX, among others—to be stored on the devices and browsers of Claimant and those similarly situated despite their rejections of all cookies. As a result, Respondent caused the sharing, and ultimately the sale, of broad swaths of personal data about Claimant, and similar users, to undisclosed third parties, contrary to Respondent's representations and Claimant's express directions. Respondent brings this arbitration solely to establish that the separate cookie dispute is not arbitrable.

## PARTIES

7.     Claimant Hope Kambick is, and was at all relevant times, an individual and resident of California. Claimant intends to remain in California and makes her permanent home there.

---

[3] On or about December 5, 2023, Claimant notified Respondent of its ongoing invasions of privacy and alleged violations of law, as described herein, as required under California's Consumers Legal Remedies Act, Cal. Civil Code §§ 1750 *et seq*., and Consumer Privacy Rights Act, Cal. Bus. & Prof. Code §§ 1798, *et seq*.

8.     Respondent  Luxottica of America, Inc. an Ohio corporation with its principal place of business in Mason, Ohio.

### **SUBSTANTIVE ALLEGATIONS**

### A.     **Respondent's Unenforceable Browsewrap Agreement.**

9.     At the time that Claimant visited the Website and the underlying dispute arose, Respondent's Website included a TOU that purports to govern the use of the Website. *See* TOU (Version last updated October 21, 2022) ("These TOU together with our Privacy Policy, terms of sale and returns and exchange policy ("Additional Policies") are a legal agreement ("Agreement") between you ("You", or "you") and Luxottica of America Inc., its parents, subsidiaries, affiliates, representatives, officers, and directors (collectively, "Luxottica", "us", "we, or "our"), as owner of Lenscrafters (the "Website"), and govern your use of the Website.").

10.     The TOU purported to require Website users to arbitrate all disputes with Respondent in AAA. *See* TOU (Version last updated October 21, 2022) ("You and Luxottica each agree that any and all disputes or claims with or against any party that relate to or arise from your use of or access to this Website, or any products or services sold, offered, or purchased through our Website shall be resolved exclusively through final and binding arbitration, rather than in court… The arbitration will be conducted by the American Arbitration Association ("AAA") under its rules and procedures…") Further, the arbitration provision contained a delegation clause that grants exclusive authority to the arbitrator to resolve disputes relating to the formation of the agreement to arbitrate. ("The arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute arising out of or relating to the interpretation, applicability, enforceability or formation of this Agreement to Arbitrate, any part of it, or of this Agreement including, but not limited to, any claim that all or any part of the Agreement to Arbitrate or this Agreement is void or voidable.")

11.     Claimant, however, did not assent to the TOU or the arbitration provision contained therein. An internet contract is valid only if the user takes some action to unambiguously manifest assent to the contract after the website has placed the user on actual notice of the terms of that contract or has put a reasonably prudent user on inquiry notice of those

terms. Claimant never saw the TOU, or even the hyperlink to "Terms of Use," and thus had no actual notice that her continued browsing of the Website would be subject to an arbitration agreement.

12.    Nor did the Website place Claimant on inquiry notice of the TOU because it failed to provide reasonably conspicuous notice of the TOU. Moreover, Claimant took no action, such as clicking a button or checking a box, that unambiguously manifested her assent to the TOU. The Terms on the Website are no more than an unenforceable browsewrap agreement.

13.    When users visited the Website, Respondent immediately displayed to them a cookie pop up banner which prompted users to either "Accept All Cookies" or visit the "Cookie Manager." The cookies pop up banner remained displayed, obscuring the Website's main content, until users make a selection on the banner. The cookies pop up banner did not require the user to manifest assent to the Terms.



(Screenshot LensCrafters Website showing cookie banner.)

14.    Website users, such as Claimant, who clicked the "Cookie Manager" link on the cookies banner to indicate their choice and/or agreement to manage cookies were directed to an additional "Privacy Preferences" window. This window made no mention of the TOU. Nor did it require users to manifest assent to the Terms. In that window, users could click reject analytics, social, and marketing cookies as shown in the screenshot below.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



(Screenshot LensCrafters Website showing "Privacy Preferences" window.)

15.    After making their selections in the Privacy Preferences window, users could then continue to browse the Website, as the cookie pop up banner and Privacy Preferences window disappeared.

16.    Respondent never required Claimant to manifest consent to the TOU; it purports to bind users to the TOU simply by their continued use of the Website, which is legally insufficient.

**B.    Claimant's Experiences**

17.    During the last year, Claimant visited the LensCrafters Website to browse products.

18.    When Claimant visited the LensCrafters Website, the Website immediately presented her with Respondent's cookie pop up banner as it appeared at the time.

19.    Consistent with her typical practice in rejecting cookies and/or the sale of her personal data, Claimant selected and clicked the "Cooke Manager" link. Claimant was then presented with Respondent's "Privacy Preferences" window then in effect at the time. Claimant toggled off all cookie categories, giving Respondent notice that she did not consent to the use or placement of third-party cookies. Further, Claimant specifically rejected those cookies that would enable the sale or sharing of her personal data. In reliance on these representations and promises, only then did Claimant continue browsing the Website.

20.    Claimant did not view the TOU on the Website prior to rejecting all cookies, or at any point thereafter.

## CAUSE OF ACTION

### Declaratory Judgment that the Underlying Dispute is Not Subject to Arbitration

21.    Claimant realleges and incorporates the paragraphs of this Complaint as if set forth herein.

22.    The LensCrafters Website's TOU applicable at the time of Claimant's visit to the Website purported to require arbitration of any and all disputes and to waive users' rights to bring a legal action, including a class action, in court. In particular, the TOU stated the following:

> You and Luxottica each agree that any and all disputes or claims with or against any party that relate to or arise from your use of or access to this Website, or any products or services sold, offered, or purchased through our Website shall be resolved exclusively through final and binding arbitration, rather than in court. The sole exceptions to this requirement are (a) either party may assert individual claims in small claims courts if those claims otherwise qualify for small claims court and as long as the matter remains in such court and is not removed or appealed to a court of general jurisdiction and (b) each party may bring suit in court to enjoin infringement or other misuse of intellectual property rights. The Federal Arbitration Act governs the interpretation and enforcement of this Agreement to Arbitrate section (this "Agreement to Arbitrate").

> …

> You and Luxottica agree that each of us may bring claims that relate to or arise from your use of or access to our Website, any products or services sold, offered, or purchased through our Services, or communications (including calls, texts, or emails) that relate to or arise from your use of or access to our Website only on an individual basis and not as a plaintiff or class member in any purported class

or representative action or proceeding, including but not limited to actions under the Telephone Consumer Protection Act, 47 U.S.C. § 227 et seq., the California Invasion of Privacy Act, Cal. Penal Code § 630 et seq., and other federal and state telemarketing and privacy laws.

...

The arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute arising out of or relating to the interpretation, applicability, enforceability or formation of this Agreement to Arbitrate, any part of it, or of this Agreement including, but not limited to, any claim that all or any part of the Agreement to Arbitrate or this Agreement is void or voidable.

...

The arbitration will be conducted by the American Arbitration Association ("AAA") under its rules and procedures, including the AAA's Supplementary Procedures for Consumer-Related Disputes (as applicable), as modified by this Agreement to Arbitrate. The AAA's rules and a form for initiating arbitration proceedings is available on the AAA's site at http://www.adr.org.

TOU (last updated October 21, 2022).

23.     Claimant did not view, and did not have actual notice of, Respondent's TOU, including the arbitration provision contained therein.

24.     Respondent did not require users such as Claimant to manifest their unambiguous assent to the TOU by clicking a button or checking a box.

25.     Claimant, therefore, had no notice, constructive or otherwise, of the TOU and never assented to them.

26.     Because Claimant did not assent to the Terms, Claimant is entitled to, and seeks, a declaration that the arbitration provision and class action waiver contained in the TOU are unenforceable and that the underlying dispute described herein is not subject to arbitration.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **PRAYER FOR RELIEF**

**WHEREFORE**, reserving all rights, Claimant respectfully requests judgment against Respondent as follows:

27.    An order declaring that Claimant did not assent to Respondent's TOU and that the underlying dispute described herein is not subject to arbitration;

28.    For reasonable attorneys' fees and the costs incurred; and

29.    For such further relief as may be just and proper.

Dated: August 12, 2024

GUTRIDE SAFIER LLP

*/s/ Seth A. Safier*
Seth A. Safier (State Bar No. 197427)
  seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
  marie@gutridesafier.com
Kali R. Backer (State Bar No. 342492)
  kali@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile:  (415) 449-6469

*Attorneys for Claimant*

# EXHIBIT B

AMERICAN
ARBITRATION
ASSOCIATION®
INTERNATIONAL CENTRE
FOR DISPUTE RESOLUTION®

## AMERICAN ARBITRATION ASSOCIATION
## CONSUMER ARBITRATION RULES

In the Matter of the Arbitration between

Case Number: 01-24-0007-2241

Hope Kambick,

     Claimant,

v.

Luxottica of America, Inc.,

     Respondent

## ORDER OF ARBITRATOR

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration provision of the Lenscrafters Terms of Use, updated in July, 2023 (the "TOU"), having been duly sworn, and having examined and considered the submissions, allegations, and arguments of the Parties, both represented by counsel, on **Claimant's Motion Regarding Non-Arbitrability,** hereby finds, concludes and issues this Order as follows.

I.  Background

On August 12, 2024, Claimant Hope Kambick filed a demand for arbitration with the American Arbitration Association ("AAA") against Respondent Luxottica of America, a company that sells eyeglasses and vision prescription services (e.g., eye exams) primarily under the "Lenscrafters" brand name, to challenge the arbitration provision of the TOU.  Respondent owns and operates the Lencrafters website, www.Lenscrafters.com (the "Website"), which allows visitors to, among other things, search for and order Lenscrafters eyeglasses and make appointments for eye exams.

According to Claimant, she visited the Website on four occasions spanning from January 2022 through November 2023.  Respondent allegedly integrated the Website with cookies from third parties, which, among other things, track users' behavior on these and other websites across the Internet.  Each time Claimant visited the Website, she was presented with a popup "Cookie Banner."  The banner indicated that Respondent used cookies to track users, but that Claimant could manage her selections, i.e., opt out of such tracking, by visiting the site's "Cookie Manager." A screenshot of the Cookie Banner is shown below.

Luxottica of America uses cookies, script code, and other technologies to collect data and/or monitor your interactions on our sites. By proceeding to the site or clicking "Accept All Cookies", you consent to such use. For more information, please see our **Privacy Policy** and **Terms of Use**. To manage your selections, please see our **Cookie Manager**.

ACCEPT ALL COOKIES

Claimant alleges that she did so, and was presented with a "Privacy Preferences" window that represented that users could opt out of certain cookies, including "Analytics, Social, and Marketing" cookies.  Claimant set all such cookies off.

Claimant further alleges that there was no click or check-box agreement to the TOU in the initial Cookie Banner presented to her.  Nor was there one in the Privacy Preferences window she used to reject all nonessential cookies.  She alleges that the Privacy Preferences window does not mention the TOU.

Claimant acknowledges that the Cookie Banner contains the "Terms of Use" hyperlink, but alleges that the Terms of Use hyperlink is displayed in the same color as surrounding text, and without requiring any unambiguous affirmative consent, such as a check box.

Despite her selection of "Reject All" cookies, Claimant alleges, Respondent caused such cookies to be placed on her device in violation of California laws.  As a preliminary matter, however, Claimant seeks to resolve the threshold question of whether the TOU control this dispute, i.e. whether she agreed to the arbitration provision of the TOU, which Respondent has indicated it will enforce.

Claimant alleges that the Website had slightly different Terms of Use at the times she visited.  Specifically, there was a 2021 Terms of Use (the "2021 TOU"), which Respondent amended in October 2022 (the "2022 TOU") and July 2023 (the "2023 TOU").  Each of the TOU contained an arbitration provision, albeit in slightly different form.  All include a class action waiver. The July 2023 version contains a clause to "supersede all prior or contemporaneous communications and proposals," and all have a clause purporting to allow Respondent to unilaterally change the TOU at any time, with the user's continued visits purportedly providing consent to any changes.  Accordingly, without conceding that such provisions are enforceable, Claimant states in her motion that she uses the 2023 TOU as the controlling version and addresses differences between the various TOU where appropriate.

By and large, Respondent does not dispute Claimant's factual allegations but disagrees in that it believes they support a finding of Claimant's assent to the TOU.  Also, Respondent alleges that different versions of the TOU were in effect in January 2022, February 2023, August 2023, and November 2023, which are different than Claimant's allegations, but this discrepancy does not need to be addressed because none of the issues in this Motion revolve around that discrepancy.

A sole arbitrator was appointed pursuant to the TOU and took oath on December 12, 2024.  A Preliminary Management Hearing ("PMH") was held on February 3, 2025.  At the PMH, Claimant made an unopposed request to file a Motion Regarding Non-Arbitrability, which was granted.  Claimant filed Opening Brief on March 27, 2025.  Respondent filed Opposition on April 28, 2025.  Claimant filed Reply on May 12, 2025.  An Oral Hearing on the Motion was held on May 6, 2025.

II. Discussion

   A.  Legal Standard for Arbitration

    "[T]he Federal Arbitration Act (FAA) makes agreements to arbitrate 'valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'" A*T&T Mobility LLC v. Concepcion*, 563 U.S. 333, 336 (2011) (quoting 9 U.S.C. § 2). "By its terms, the [FAA] leaves no place for the exercise of discretion by a [tribunal], but instead mandates that [tribunals] shall direct the parties … arbitrat[e ] issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985). "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983).

    The same principles and framework apply with equal force under California law and the California Arbitration Act ("CAA").  California Code Civ. Proc. § 1281.2 provides that a "court shall order the petitioner and the respondent to arbitrate a controversy if it determines that an agreement to arbitrate the controversy exists….". The California Supreme Court held that "the legislature has expressed a strong public policy in favor of arbitration" and that "court will indulge every intendment to give effect to such proceedings." *Moncharsh v. Heily & Blasé,* 3 Cal.4th 1, 9 (1992) (citing Code Civ. Proc. § 1280 et seq.). Under the CAA, "arbitration agreements should be liberally interpreted, and arbitration should be ordered unless the agreement clearly does not apply to the dispute in question." *Vianna v. Doctors' Mgmt. Co*., 27 Cal.App.4th 1186, 1889 (1994); *see also Gravillis v. Coldwell Banker Residential Brokerage Co*., 143 Cal.App.4th 661, 770-771 (2006) ("The court's role … must be strictly limited to a determination of whether the party resisting arbitration agreed to arbitrate.")

    Nevertheless, arbitration is "a matter of contract[.]" *United Steelworkers v. Warrior & Gulf Navigation Co*. 363 U.S. 574, 582 (1960).  The party seeking to compel arbitration has the burden of proving the existence of an agreement. *Sifuentes v. Dropbox, Inc.*, No. 20-cv-07908-HSG, 2022 U.S. Dist. LEXIS 125273, at *7 (N.D. Cal. June 29, 2022).  Such party must offer sufficient evidence to establish that there was "mutual consent" to its proffered terms.  This "applies with equal force to arbitration provisions contained in contracts purportedly formed over the Internet." *Long v Provide Commerce, Inc*., 245 Cal. App. 4th 855, 862 (2016).

   B.  Burden of Proof

    The Parties disagree over who bears the burden of proof as to the existence of arbitration agreement.  Claimant argues that Respondent bears the burden because it is the party that wants to compel arbitration.  Respondent, on the other hand, argues that as the proponent of the motion, Claimant bears the burden of proof.  *See United States v. Veon,* 538 F. Supp. 237, 245–46 (E.D. Cal. 1982) ("The general rule is that the proponent of a motion bears the burden of proof.").  Furthermore, as Claimant seeks the declaratory relief that the parties did not form an agreement to arbitrate, Respondent argues, Claimant bears the burden of demonstrating her entitlement to the relief. *See Siino v. Foresters Life Ins. & Annuity Co*., 133 F.4th 936, 945 (9th Cir. 2025) ("a plaintiff seeking declaratory relief must adduce an evidentiary record sufficient to support the terms of their requested declaration").

    Neither Party, however, has submitted a case on point that entirely resolves the dispute over the burden of proof.  As Claimant filed the demand for arbitration and motion to avoid being compelled to arbitrate, whereas Respondent advocates arbitrating, the underlying dispute, it seems fair to assign

Claimant the burden of going forward and Respondent the ultimate burden of persuasion.  Under that framework, Claimant has met her burden of going forward because she demonstrated that there was no formal or written agreement to arbitrate the underlying dispute.

The sole basis offered by Respondent for arbitration is actual or constructive notice of the TOU to Claimant.  Thus, the arbitrability determination turns on whether Claimant had either actual or constructive notice of the TOU that justifies being compelled to arbitrate the underlying disputes.

C.  Did Claimant Agree to the TOU?

a)  Formation of Contracts

In determining whether a valid arbitration agreement exists, the Arbitrator must apply "ordinary state-law principles that govern the formation of contracts." *First Options of Chic., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). Here, the TOU provides the laws of the State of Ohio as the applicable law. Claimant, however, asserts that, as she is claiming that she did not agree to the TOU, California law should apply to the formation of contracts issue.  Respondent does not disagree, or at a minimum, does not believe that there is a meaningful difference between Ohio and California laws when it comes to contract formation.  Thus, the California law will apply in determining whether Claimant agreed to the TOU.

To form a contract under California law, the parties must manifest their mutual assent to the terms of the agreement. *See Specht v. Netscape Communications Corp.*, 306 F.3d 17, 29 (2d Cir. 2002) (applying California law).  Parties usually manifest assent by written or spoken word, but "[t]he manifestation of assent may be made wholly or partly … by other acts or by failure to act." Restatement Second of Contracts § 19 (1981). However, "[t]he conduct of a party is not effective as a manifestation of his assent unless he intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents." *Id.*

This applies to online contracts as well. *See Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014) (differentiating browsewrap and clickwrap agreements and requiring unambiguous manifestation of consent to create agreement to arbitrate).  If a website offers contractual terms to those who use the Websites, and a user engages in conduct that manifests her acceptance of those terms, an enforceable agreement can be formed. *Berman v. Freedom Financial Network, LLC,* 30 F.4th 849, 855–56 (2022). However, when the user "does not know that a proposal has been made to him this objective standard does not apply." *Id.* at 993. The user is "not bound by inconspicuous contractual provisions of which he was unaware, contained in a document whose contractual nature is not obvious." *Id.*

b)  Whether Claimant Had Actual or Constructive Notice of the TOU

Respondent does not dispute that there was no written or oral agreement showing that Claimant agreed to the TOU.  It, however, argues that Claimant agreed to the TOU because she had notice of the TOU.  In order to prove the formation of a contract under such theory, there must be a showing of "actual or constructive notice of the agreement" and a "manifest[ation of] mutual assent." *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 512–13 (9th Cir. 2023).  To determine whether Claimant had constructive notice, the Arbitrator must consider "the design and content of the website and the agreement's webpage." *Nguyen* 763 F.3d at 1177.  "[A]n enforceable agreement will be found based on an inquiry notice theory only if: (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms.'" *Berman, 30 F.4th* at 856.

4

For a notice to be reasonably conspicuous, it "must be displayed in a font size and format such that the court can fairly assume that a reasonably prudent ... user would have seen it." *Id.* Continued use of website does not amount to consent to arbitrate. *Id.* at 853 ("…defendants moved to compel arbitration, arguing that plaintiffs' use of the websites signified their agreement to the mandatory arbitration provision found in the hyperlinked terms and conditions. The district court rejected this argument, and so do we.")

Here, Respondent claims that Claimant had both actual and constructive notice because when she visited the Website and clicked a "Cookie Manager" hyperlink in the Cookie Banner, she was also presented with a hyperlink to the "Terms of Use." The screenshot of the Cookie Banner indeed shows that "Cookie Manager" and "Terms of Use" hyperlinks next to each other in the same manner and color, i.e. underlined and bold. Respondent argues that this presentation alone is sufficient to demonstrate actual notice. Respondent goes on to argue that Claimant's statements that she "never saw the [Terms,]" "did not view the [Terms] on the Website," and does not recall "clicking on any link leading to Respondent's [Terms]," does not change this conclusion. It asserts whether Claimant had notice of the Terms—not whether she read them.

In other words, Respondent is arguing that the presentation of the hyperlink "Terms of Use" in the Cookie Banner is sufficient to show her assent to the "Terms of Use." Such presentation may satisfy the first prong of notice under *Berman*, i.e., "(1) the website provides reasonably conspicuous notice of the terms ... ", but completely ignores the second prong, i.e. whether "(2) the consumer [took] some action…that unambiguously manifests his or her assent to those terms." There must be some action or conduct by Claimant that manifest her assent to the Terms of Use or TOU. By arguing that it is of no consequence whether Claimant "click[ed] on any link leading to Respondent's [Terms]," or even saw the hyperlink, Respondent is acknowledging that it cannot show any conduct by Claimant that shows unambiguous assent.

Respondent does not do any better with its constructive notice argument. It argues that even if Claimant did not have actual notice, she had constructive notice because the Terms of Use were presented in a clear and conspicuous manner on all four times she visited the Website. Again, this may satisfy the first prong but does not address the second prong under *Berman* at all. Respondent does not point out any conduct on the part of Claimant that is an unambiguous manifestation of her assent to the TOU. Her four visits to the Website or continuous use of the Website after the presentation of the Terms of Use hyperlink cannot show her unambiguous assent to the TOU. She could have assented and continued to use, or not assented and continued to use, the Website. In fact, as discussed above, the 9th Cir. held that simply continuing to browse a website with an arbitration provision in the terms of use is not enough to manifest the user's assent to the arbitration provision. *See Berman* at 856.

The cases cited by Respondent in support of its arguments are inapposite. In *Callaway v. Anheuser-Busch Companies, LLC,* No. CV 24-704-JFW(PVCX), 2024 WL 1260806 (C.D. Cal. Mar. 18, 2024), the court found that the plaintiffs had actual notice of the terms of use because they admitted in their complaint that they accessed downloaded, used, or completed sales transactions through the defendants' platforms and that that the platform visitors, or users, were informed that they must agree to the defendants' terms of use. *Id.* at *5. In fact, the plaintiff there admitted in the complaint that they were subject to the terms of use. *Id.* In this case, Claimant avers that she did not agree to the TOU and denies that her claims are subject to arbitration.

*Cairo, Inc. v. Crossmedi Services, Inc.* 2005 WL 756610 (N.D. Cal. Apr. 1, 2005) involves a declaratory judgment plaintiff who had accessed the defendant's website many thousands of times per month and deep-linked to the defendant's webpages, facts not present in this case.

*Ashbey v. Archstone Property Management, Inc.,* 785 F.3d 1320 (2015) is an employment case where the employee signed a document entitled "Acknowledgment of Receipt of Archstone Company Policy Manual 2009" that included a mandatory arbitration provision. *Id.* at 1321-1322.  In this case, Claimant did not sign any arbitration agreement with Respondent.

In *Nguyen v. Barnes & Noble Inc.,* 763 F.3d 1171 (9th Cir. 2014), the consumer was presented the website's "Terms of Use" that contained a mandatory arbitration agreement via a hyperlink. *Id.* at 1174. Much like Claimant in this case, the consumer there neither clicked on the "Terms of Use" hyperlink nor actually read the Terms of Use. *Id.* This led to the 9th Cir. holding that the consumer had insufficient notice of the "Terms of Use" and did not enter into an arbitration agreement with the business.

III. Conclusion

For the reasons discussed above, Claimant's claim is not subject to arbitration.  Claimant's Motion Regarding Non-Arbitrability is thus GRANTED.

As the claim in this case is not arbitrable, I declare this case DISMISSED with PREJUDICE.

This Order is in full settlement of all claims submitted to this Arbitration. All claims not expressly granted herein are hereby denied.


IT IS SO ORDERED.


|  |  |
|---|---|
| May 29, 2025 | *Kenneth S. Korea* |
| Date | Kenneth S. Korea |
|  | Arbitrator |